# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-1059
_____

United States of America,      *
                        *
      Appellee,          *
                        *
   v.                    *
                        *
James R. Nichols,        *
                        *
      Appellant.       *

_____

No. 04-1062

_____

                             Appeals from the United States
                             District Court for the
                             Western District of Missouri.

United States of America,      *
                        *
      Appellee,          *
                        *
   v.                    *
                        *
Robert Gomez,          *
                        *
      Appellant.       *

_____

Submitted: January 10, 2005
Filed: August 5, 2005

_____

Before SMITH, HEANEY, and COLLOTON, Circuit Judges.

_____

SMITH, Circuit Judge.

James R. Nichols and Robert Gomez appeal their convictions of conspiracy to commit interstate transportation of property by fraud, interstate transportation of property stolen by fraud, conspiracy to commit money laundering, money laundering, and civil forfeiture. Following a joint-jury trial, the district court[1] sentenced Nichols to a total term of 292 months' imprisonment and Gomez to a total term of 262 months' imprisonment. We affirm.

## I. *Background*

Between 1998 and 2002, Nichols and Gomez masterminded a nationwide fraud and money-laundering scheme involving the sale of nonexistent motor vehicles from a nonexistent probate estate. To perpetrate the fraud, Gomez claimed to be the adopted son of one John Bowers, deceased, and the sole heir to his estate. Nichols represented himself as the executor of John Bowers's estate. In actuality, there was no John Bowers. Nichols and Gomez created Bowers, and then used this fictitious person to defraud others–primarily persons of religious faith.

To snare the unwary, Nichols and Gomez told potential investors that John Bowers had died and left an estate worth approximately $400 million. According to the two, Bowers left instructions to reward persons of religious faith by offering them the opportunity to purchase automobiles at a very low price.[2] The vehicles were said to be between one and two-years old and were offered for sale at prices between $1000 and $5000. Nichols and Bowers told purchasers that they would have to pay for the cars up front, and that their money would be placed in a non-interest bearing

---

[1]The Honorable Nanette K. Laughrey, United States District Judge for the Western District of Missouri.

[2]As the scheme gained publicity, the low-priced vehicles became known as the "miracle cars" or the "estate cars."

account until the estate closed. Supposedly, the probate judge imposed restrictions preventing the disclosure of details about the individual cars. However, purchasers could request a refund of their purchase money at any time.

The scheme was initially aimed at members of Nichols's home church in southern California. However, as news of the vehicles spread, other southern California churches were targeted. At first, only Nichols's family promoted the sale of the "estate cars," but others were eventually enlisted to spread the word. Gwendolyn Baker, a resident of Memphis, Tennessee, began selling the "estate cars" through churches in the Memphis area after contacting Nichols and Gomez. Baker was later introduced to Dr. Corinne Conway of Higginsville, Missouri, who then promoted the sale of the fictitious cars nationwide through her organization, the Virtuous Women's International Ministry. Unwitting people across the nation sold the fictitious cars to members of their local churches because of Dr. Conway's promotions. Those within the scheme called these persons "finders" because they found purchasers for the "estate cars."

Money collected through Baker, Dr. Conway, and the finders was funneled to Nichols who deposited the funds in a California bank account. Nichols would then transfer a portion of the funds to California casino accounts where Gomez would exchange the money for casino chips or cash. Nichols also made direct withdrawals from the account to get cash, make transfers to family members, and to buy vehicles. In addition, as the scheme progressed, Nichols would refund money to purchasers of the "estate cars" who were unwilling to wait for delivery. Over the course of the scheme, Gomez and Nichols collected more than $21 million from the sale of the "estate cars," but refunded approximately $8.5 million.

The car scam began to run out of gas when the Missouri Attorney General's Office was notified of the scheme and began an investigation. The United States Postal Inspectors and the Federal Bureau of Investigation later joined in the

investigation. From those investigations, a Missouri Grand Jury returned a twenty-three count indictment against Gomez and Nichols.

Prior to trial, Gomez and Nichols sought to have their respective cases severed and tried separately. The district court denied their motions. Gomez also sought to dismiss the money laundering counts of the indictment for lack of venue. The district court also denied that motion. At trial, Nichols testified in his own defense claiming that Gomez had set him up. Gomez did not testify. The jury returned guilty verdicts against both Nichols and Gomez. After reviewing a presentence investigation report (PSR), and conducting a sentencing hearing, the district court sentenced Nichols to a total term of 292 months' imprisonment and Gomez was sentenced to a term of 262 months' imprisonment. This joint appeal followed.

## II. *Discussion*

Together, Nichols and Gomez assert a total of eight points on appeal. Some arguments are pressed by both, and others are brought independently. We address the joined arguments together, and the individual arguments will be addressed separately.

## A. *Severance – Nichols and Gomez*

Both Nichols and Gomez assert that the district court erred in refusing to sever the trial. They maintain that their mutually antagonistic defenses necessitated severance. We review a district court's denial of a motion to sever for an abuse of discretion. *United States v. Mickelson*, 378 F.3d 810, 817–18 (8th Cir. 2004). In order to reverse, the appellant must show that his or her right to a fair trial was prejudiced. *Id.*; *see also Zafiro v. United States,* 506 U.S. 534 (1993). Defendants who are jointly indicted on similar evidence from the same or related events should normally be tried together; to warrant severance a defendant must show "real prejudice"; that is, "something more than the mere fact that he would have had a better chance for acquittal had he been tried separately." *Mickelson,* 378 F.3d at 817–18. (citations omitted). A defendant can demonstrate real prejudice to his right to a fair trial by

showing: (1) his defense is irreconcilable with that of his co-defendant; or (2) the jury will be unable to compartmentalize the evidence as it relates to the separate defendants. *Id.* However, severance is not required merely because evidence that is admissible only against some defendants may be damaging to others. *Id*.

In this case, Gomez's defense strategy was that he knew nothing about the Bowers's estate or the scheme to sell "estate cars" at low prices. He explained that he was a professional gambler and that Nichols was "backing his play" as an investment. Nichols, on the other hand, claimed that he was duped and misled by Gomez who alone masterminded the entire scheme. To that extent, Nichols claimed that he actually believed Gomez was the heir of the Bowers's estate and that the sale of the "estate cars" was completely legitimate.

"Mutually antagonistic defenses are not prejudicial *per se.*" *Zafiro v. United States,* 506 U.S. 534, 538 (1993). The Supreme Court specifically rejected the notion that defendants who have contradictory defenses are inherently prejudiced simply because "a jury will conclude [either] that both defendants are lying and convict them both on that basis, or that at least one of the two must be guilty without regard to whether the Government has proved its case beyond a reasonable doubt." *Id.* at 540; *see also United States v. Blankenship*, 382 F.3d 1110, 1125 (11th Cir. 2004) ("The Supreme Court has held that co-defendants do not suffer prejudice simply because one co-defendant's defense directly inculpates another, or it is logically impossible for a jury to believe both co-defendants' defenses.").

We first examine whether the defenses asserted by Gomez and Nichols are actually irreconcilable. As already stated, Gomez asserts that Nichols was backing his gambling and Nichols asserts that Gomez duped him. These two stories are reconcilable. Specifically, Nichols could very well have been duped by Gomez while at the same time giving Gomez money to finance his professional gambling. Stated another way, Nichols's contention that he was duped did not necessarily require that

the jury either accept or reject the defense that Gomez merely received gambling support funds. Likewise, Gomez's contention did not require the jury to accept or reject the defense that Nichols was an unwilling participant.

Neither Gomez nor Nichols disputes that nonexistent cars were sold with much of the proceeds funneled through Nichols to casinos where Gomez received the funds in the form of gambling chips. *See United States v. Serafino*, 281 F.3d 327, 330 (1st Cir. 2002) ("Serafino never disputed that the MBC vendors funneled payments through his companies' accounts, and Peckham's contention that he was neither the mastermind nor the driving force behind the scheme did not necessarily require that the jury either accept or reject the defense that Serafino was an unwitting participant."). At their core, both Nichols's defense and Gomez's defense asserted that they did not know of the fraud. *See United States v. Jackson*, 64 F.3d 1213, 1217 (8th Cir. 1995) *cert. denied,* 516 U.S. 1337 (1995) (holding that defenses by drug offense co-defendants that neither had knowledge of drugs in a package were reconcilable).

We next examine whether the jury could compartmentalize the evidence. We have held that in reviewing the "consideration of the jury's ability to compartmentalize the evidence against the joint defendants, we consider 1) the complexity of the case; 2) if one or more of the defendants were acquitted; and 3) the adequacy of admonitions and instructions by the trial judge." *United States v. Pherigo*, 327 F.3d 690, 693 (8th Cir. 2003). The case against Gomez and Nichols was not complex. At trial, the government contended that Gomez pretended to be the heir of a fictitious estate while Nichols acted as the executor of that estate. According to the government, Gomez and Nichols both claimed that the estate was selling automobiles at reduced prices that would be delivered upon the probate court's closing of the estate. They collected money from sales of phantom vehicles which went to Nichols, who then diverted a portion of that money to Gomez through casinos. Indeed, the charges against Gomez and Nichols were virtually identical, save a few independent incidents. Neither party was acquitted.

Lastly, neither defendant objected to the district court's jury instructions. We, therefore, do not find the trial judge's admonitions and instruction to the jury inadequate. Blame-shifting on the part of the defendants "is not a sufficient reason for severance." *United States v. Basile*, 109 F.3d 1304, 1310 (8th Cir. 1997) (en banc) (citing *United States v. Bordeaux,* 84 F.3d 1544, 1547 (8th Cir.1996)). Here, Nichols and Gomez simply pointed the finger, each admitting that a scheme was employed, but both asserting that they had no knowledge of the fraud. They have failed to show that the jury could not have considered the evidence against each of them independently. Under these circumstances, we cannot say that the district court abused its discretion.

B. *Erroneous Submission of Documents*
*During Jury Deliberations – Nichols*

After deliberations commenced, one juror notified the district court that the jury had erroneously been given a box of investigation reports prepared by an agent of the California Division of Gaming Control.[3] Attached to some of the reports were search warrant affidavits and probable cause declarations. When Nichols's defense counsel learned of the error, a motion for mistrial was immediately made. At that point, the district court conducted a voir dire of the jury to determine whether any of the jurors had actually read the documents. All jurors denied reading the documents. Satisfied that there had been no prejudice by the erroneous submission of the documents, the district court denied Nichols's motion for mistrial. The jurors were allowed to deliberate and then returned a guilty verdict. The court, again, confirmed that none of the jurors considered the erroneously submitted documents.

---

[3]The jury requested to see certain documents admitted at trial, and the deputy clerk gave them a box of documents that mistakenly contained investigation reports that were not admitted into evidence.

We have held that a denial of mistrial based on the erroneous submission of evidence to the jury will be reviewed for an abuse of discretion. *United States v. Rhodenizer*, 106 F.3d 222, 225 (8th Cir. 1997). For reversal, the appellant must show that an abuse of discretion resulted in clear prejudice. *Id*.[4] Nichols's claim of prejudice supposes that the jury actually read the documents and considered them in deliberations. The district court's jury poll, which showed no juror read the disputed documentation, contradicts Nichols's claim of prejudice, which amounts to no more than speculation. Even where the trial court errs, it can often avert any undue prejudice by giving a curative instruction. *Id.* Nichols has failed to show that the mistake in submitting these documents affected the jury deliberations in any way. A defendant is entitled to a "fair trial, not a perfect one." *Id.* (citation omitted). We cannot say that the district court abused its discretion in denying the mistrial motion. Furthermore, based on the district court's careful polling and admonition of the jurors, we hold that any error in erroneously submitting the documents to the jury was harmless.

### C. *Sentencing Errors*

Both Nichols and Gomez argue on appeal that the district court erred by finding facts to enhance their sentences and by viewing the Guidelines as mandatory. *See United States v. Booker*, 125 S. Ct. 738 (2005) (holding that the Sixth Amendment to the United States Constitution requires that facts "necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt," and excising the portion of the Sentencing Reform Act of 1984

---

[4]In *Rhodenizer*, we held that the jury's viewing of inadmissible drug paraphernalia mistakenly left in a bag entered into evidence, though error, did not result in clear prejudice, and thus did not require a mistrial. We explained that the other evidence against the defendant was extremely strong, the government had already introduced photographs of drug paraphernalia found in a camper shell of the defendant's truck, and the court issued a curative instruction admonishing the jury not to consider the contents of the bag. 106 F.3d at 225.

that made the Guidelines mandatory.). The district court made factual findings to support sentence enhancements and applied the Sentencing Guidelines as mandatory. Neither Nichols nor Gomez objected to the court's application of the Guidelines with specific reference to *Apprendi*, *Blakely*, or the Sixth Amendment, and thus, we review the Sixth Amendment claims for plain error. *United States v. Pirani*, 406 F.3d 543, 549–50 (8th Cir. 2005) (en banc).

Our plain error analysis of *Booker* issues focuses on "what sentence *would have been* imposed absent the error." *Pirani*, 406 F.3d at 551. (emphasis in original). Under this standard, an appellant must demonstrate "a reasonable probability that he [or she] would have received a more favorable sentence with the *Booker* error eliminated by making the Guidelines advisory." *Id*. Because "[n]othing in the record suggests a reasonable probability that the district court would have imposed a more lenient sentence absent *Booker* error, . . . [Nichols and Gomez] ha[ve] not carried [their] burden." *Id*. at 553.

### 1. *Amount of Loss Under U.S.S.G. § 2B.1.1 – Nichols and Gomez*

Nichols and Gomez join in arguing that the district court erred in calculating the total loss resulting from their fraud. Specifically, Nichols and Gomez contend that the court erred in not giving them credit for $1,259,800 which was refunded prior to the scheme's detection. Beginning in January 1, 1999 Nichols and Gomez collected a total of $21,123,830 from the car sales scheme. Of that amount, about $8,000,000 was refunded, and of the refund amount, $1,259,885 was refunded prior to the offense being detected. The district court ruled that the total loss would be based on a figure greater than $20,000,000. Nichols and Gomez argue that they should have received credit for the $1,259,885 refunded prior to March 30, 2000,[5] resulting in a total loss of just under $20,000,000.

---

[5]March 30, 2000, is the approximate time that Nichols and Gomez were contacted by a criminal investigator.

We review the application of Sentencing Guidelines de novo. *United States v. Mashek*, 406 F.3d 1012, 1016 (2005); *United States v. Red Elk*, 368 F.3d 1047, 1051 (8th Cir. 2004). However, "[l]oss calculations also involve factual findings, which we review for clear error and reverse only if 'we are left with a definite and firm conviction that the district court erred.'" *United States v. Liveoak*, 377 F.3d 859, 866 (8th Cir. 2004) (citations omitted); *See also Mashek*, 406 F.3d at 1017 (citing *United States v. Killgo*, 397 F.3d 628, 631 (8th Cir. 2005)). The Guidelines provision applicable to fraud cases provides for a graduated increase in the base offense level depending on the amount of loss resulting from conduct relevant to the count of conviction. U.S.S.G. § 2B1.1. Under the Sentencing Guidelines, the base offense level for fraud is adjusted upward if the loss resulting from the fraud exceeded $5,000. *See* U.S.S.G. § 2B1.1(b)(1). Where the loss is greater than $20,000,000 but not more than $50,000,000, twenty-two levels are added. U.S.S.G. § 2B1.1(b)(1)(L). When the loss is greater than $7,000,000 but not more than $20,000,000, twenty levels are added. U.S.S.G. § 2B1.1(b)(1)(K). Thus, Nichols and Gomez argue that they were erroneously assessed an additional two offense levels.

Application Note 3(E)(i) to U.S.S.G. § 2B1.1, states in pertinent part:

> *Credits Against Loss.* – *Loss shall be reduced by the following:*
> *(i)*      *The money returned . . . to the victim before the offense was detected. The time of detection of the offense is the earlier of (I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected by a victim or government agency.*

U.S.S.G. § 2B1.1, cmt. n.3(E)(i). In addition to this application note, Nichols and Gomez point to Ninth Circuit precedent stating that "[a] fraud defendant is entitled to credit for refunds paid prior to the discovery of the offense." *United States v. Bright*, 353 F.3d 1114, 1118 (9th Cir. 2004). Moreover, the Seventh Circuit has

adopted a "credit against loss" approach to the calculation of fraud victim loss amounts for Sentencing Guidelines purposes. *United States v. Hausmann*, 345 F.3d 952, 960 (7th Cir. 2003) (noting the Guidelines' application notes). Likewise, we have applied a credit against losses under Application Note 3(E)(i) to the fair-market value of services rendered. *See United States v. Liveoak*, 377 F.3d 859, 867 (8th Cir. 2004).[6]

---

[6]The government argues that when a Ponzi fraud scheme is employed, there is no credit against losses under the Guidelines. "Ponzi schemes are fraudulent business ventures in which investors' 'returns' are generated by capital from new investors rather than the success of the underlying business venture. This results in a snowball effect as the creator of the Ponzi scheme must then recruit even more investors to perpetuate the fraud." *In re Armstrong*, 291 F.3d 517, 520 (8th Cir. 2002). With respect to Ponzi schemes, the Ninth Circuit explained:

> The Second, Fourth, Fifth, and Seventh Circuits have held that the loss calculation in a Ponzi scheme should not be offset by the amount of the victims' recovery. *See United States v. Carrozzella,* 105 F.3d 796, 805 (2d Cir. 1997); *United States v. Loayza,* 107 F.3d 257, 265 (4th Cir. 1997); *United States v. Deavours,* 219 F.3d 400 (5th Cir. 2000); *United States v. Lauer,* 148 F.3d 766, 768 (7th Cir. 1998); *but see United States v. Holiusa,* 13 F.3d 1043, 1046–47 (7th Cir. 1994) (holding that intended loss in a Ponzi scheme case did not include amounts ultimately returned to investors).

> These courts reason that the gravity of the crime should be measured by the entire sum of money that the schemers put *at risk* through the misappropriation regardless of whether some victims were fortunate enough to recover part of their loss. *Lauer,* 148 F.3d at 768; *cf. United States v. Janusz,* 135 F.3d 1319, 1324 (10th Cir. 1998) (adopting this line of reasoning in a fraud case where the financial consultant misappropriated clients' funds, most of which were recovered by the clients when the consultant's accounts were frozen). Because the schemers typically return money to investors to perpetuate the fraud and ensnare new investors, and not to mitigate damages to the current investors, these courts reason that they should be held accountable for all of the funds that are misappropriated. *See Carrozzella,* 105 F.3d at 805.

Even assuming Nichols and Gomez had received credit for the sums returned, the district court could have nonetheless readily found the total fraud loss exceeded $20,000,000. The district court had authority under the Guidelines to consider the loss to victims that took place prior to January 1, 1999. *See* U.S.S.G. § 2B1.1 cmt. n.3(c)) ("The court need only make a reasonable estimate of the loss. The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence. For this reason, the court's loss determination is entitled to appropriate deference."). Given the loss amount conceded by Nichols and Gomez, only an additional $135,970 was needed to reach the $20,000,000 threshold. The district court's calculation did not include the losses that occurred when Nichols and Gomez started their scheme in southern California in 1997. Indeed, the scheme was so successful in southern California that it had spread to Memphis by the fall of 1998. Furthermore, the loss calculation conceded by Gomez and Nichols did not include any finders' fees paid. The record supports a finding that over $1,000,000 in finders' fees were paid to Dr. Conway, Baker, and other finders. Under these circumstances, we are not left with a definite and firm conviction that the district court erred in calculating a total loss over $20,000,000.

---

*United States. v. Munoz*, 233 F.3d 1117, 1125 (9th Cir. 2000). The fraud perpetuated in this case was not a typical Ponzi scheme. Nichols and Gomez did not claim to have generated "returns" for investors. Instead, they refunded money to victims who requested refunds. Nonetheless, the Ponzi rationale is applicable because Nichols and Gomez returned funds to victims in order "to perpetuate the fraud and ensnare new [victims], and not mitigate damages to the current victims" *See United States v. Carrozzella,* 105 F.3d 796, 805 (2d Cir. 1997). In *Lauer,* 148 F.3d at 768, the Seventh Circuit likened Ponzi schemes to a person who embezzles money from his employer, planning to gamble with it and put the embezzled money back before he is discovered. *Lauer,* 148 F.3d at 768. The Seventh Circuit explained that the embezzler should be held accountable for the amount of money he stole regardless of whether he is caught before or after he returns any winnings. *Id*.

## 2. *Perjury – Nichols*

Nichols next argues that the district court erred in enhancing his sentence based on a finding that he committed perjury in his trial testimony. In making its ruling, the district court stated:

> Every defendant does have a right to testify in their own behalf, but they do not have a right to lie under oath. And I am not relying on the jury's determination that the defendant was guilty to apply this enhancement. I'm relying on my own conclusion that his testimony was false, knowingly false, and that it was knowingly false on material issues, and intended, in fact, to deceive both the court and the jury.

We review a district court's factual findings underlying an obstruction of justice enhancement for clear error and its construction and application of the Guidelines de novo. *United States v. Mendoza-Gonzalez*, 363 F.3d 788, 796 (8th Cir. 2004). A defendant is subject to an enhancement under U.S.S.G. § 3C1.1 if he testifies falsely under oath in regard to a material matter and does so willfully rather than out of confusion or mistake. *Id.* If a defendant objects to an obstruction enhancement relying on perjury, the district court must make findings that the defendant willfully gave false testimony concerning material matters in the case. *Id.* We give "great deference" to a district court's decision to grant an enhancement for obstruction of justice, *see United States v. Calderon-Avila,* 322 F.3d 505, 507 (8th Cir. 2003), and will reverse an enhancement only when the district court's findings are insufficient, *see United States v. Brooks,* 174 F.3d 950, 958–59 (8th Cir. 1999).

The sentencing court cannot give the upward departure "simply because a defendant testifies on his own behalf and the jury disbelieves him." *United States v. Flores*, 362 F.3d 1030, 1037 (8th Cir. 2004) (quotation omitted). To do so would chill a defendant's constitutional right to testify on his own behalf. *Id.* Rather, once a defendant objects, the sentencing court must itself conduct an independent evaluation and determine whether the defendant committed perjury. *Id.* While it is preferable for

the district court to address each element of the alleged perjury in a separate and clear finding, the determination is sufficient if "the court makes a finding of an obstruction of, or impediment to, justice that encompasses all of the factual predicates for a finding of perjury." *Id*.

In this case, the district court made an independent evaluation of Nichols's testimony but did not cite to any specific testimony that was perjured. During the sentencing hearing, the government provided two bases for a finding of perjury. First, the government noted that Nichols's testimony that he had not read certain letters he signed and provided to some victims was contrary to the testimony of the victims. Second, the government adverts to Nichols's testimony that he was in a limousine with the fictitious John Bowers when Bowers was delivering gold to his ranch. This testimony is preposterous considering that John Bowers never existed. In addition, Nichols testified that he deposited money that was not gathered from the sale of "estate cars" into a bank, but the bank records do not reflect any such deposits. Nichols denied seeing certain documents–found in his nightstand–that witnesses testified he gave them. Nichols testified that he never told the victims that their money would be held in non-interest bearing accounts, but all the evidence showed the opposite.

We conclude that there was ample evidence supporting the obstruction of justice enhancement and the district court's decision is not clearly erroneous. We have affirmed the application of an obstruction enhancement in a case where the district court stated, "I heard the trial testimony, and I think [it constitutes] obstruction of justice." *United States v. Kessler,* 321 F.3d 699, 703 (8th Cir. 2003); *see also United States v. Brown,* 311 F.3d 886, 890 (8th Cir. 2002) (affirming the enhancement on the district court's statement that, "I believe the defendant did testify untruthfully").The district court did not rely wholly on the jury's determination of guilt. *See United States v. Flores*, 362 F.3d 1030, 1037 (8th Cir. 2004). Nichols's testimony was "unequivocal" and "the record left no doubt that [his] false testimony at trial was not the result of confusion, mistake, or faulty memory." *Brown* at 890 (citing *United*

*States v. Esparza,* 291 F.3d 1052, 1055 (8th Cir. 2002)). The district court made a specific finding that, based on his own evaluation, Nichols committed perjury. We find the sentence of the district court to be reasonable and affirm the application of the obstruction enhancement.

### D. *Insufficient Evidence of Money Laundering – Nichols*

Nichols alone argues that there was insufficient evidence to support his convictions for conspiracy to commit money laundering and money laundering. We will reverse a conviction for insufficient evidence only if, after viewing the evidence in the light most favorable to the jury's verdict, giving the government the benefit of all reasonable inferences that may be drawn from the evidence, no construction of the evidence will support the jury's verdict. *United States v. Beltz*, 385 F.3d 1158, 1163 (8th Cir. 2004).

The essence of Nichols's argument is that the money transfers and expenditures were done openly and without an intent to conceal. A money laundering violation requires proof of concealment, not the absence of full disclosure. *United States v. Shoff*, 151 F.3d 889, 891 (8th Cir. 1998). Here, Nichols deposited all the funds in a single bank account registered with Nichols's name and social security number. The funds were then transferred to accounts in Nichols's name and in Gomez's name at gambling casinos with checks drawn on the account and signed by Nichols. Thus, according to Nichols, there was no proof of concealment. As such, Nichols asserts that the money laundering statute has been used to criminalize mere "money spending." *See Shoff,* 151 F.3d at 892.

We have upheld money laundering convictions where there is evidence that the money transfers "made it more difficult for the true owner of the money to trace what happened to it," *United States v. Norman,* 143 F.3d 375 (8th Cir. 1998), or involved the routing of money. *United States v. Vanhorn*, 296 F.3d 713, 717 (8th Cir. 2002). In *Norman*, the defendant bought a vehicle with illegally obtained money. 143 F.3d 375. He paid for the car with a check drawn on an account of a business he

controlled, and the car was titled in the name of the same business. *Id.* Norman made no attempt to conceal from the seller of the car his own identity, or the fact that he owned the business that was to become the owner of the car. *Id.* We first explained that money laundering only requires that a defendant know that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity. *Id.* Accordingly, the point is not whether the seller of the car is deceived as to who the defendant was, but rather, by changing the proceeds of unlawful activity from the form of money–through the use of undisclosed business accounts–into the form of an automobile, it made it more difficult for the true owner of the money to trace what had happened to the funds. *Id.*

We affirmed the sufficiency of the evidence supporting Norman's money laundering convictions and noted that the illegal funds were deposited into three bank accounts held in two names, neither of which was the account known to the victim. *Id.* In addition, we relied on the fact that the subsequent purchases were made by checks, and involved automobiles and other goods that were not matters of public record. *Id.*

Similarly, in this case, Nichols's scheme employed transactions that hampered fraud victims' efforts to discover their money's location and use. Specifically, although Nichols deposited the money into a single account, he then divided the money into multiple gambling accounts, and sent cash to Gomez, Nichols, and Baker. Nichols gave some of the money in the central account to family members and funneled some to a corporation; he also used some of the proceeds to purchase vehicles. The money in the accounts was also used to pay prior debts and purchase casino chips for gambling–matters not of public record. None of these transactions were known to the victims.

In *Shoff*, the money laundering counts were based upon two automobile purchases. *Shoff*, 151 F.3d at 890–91. Shoff received a $30,000 check from his

-16-

cousin's wife, payable to Shoff personally. *Id*. He deposited the check into a newly-opened checking account in the name of Shoff Trading Limited. Four days later, he wrote a check on that account to purchase a $17,290 money order payable to a local car dealer. *Id*. The bank's records list Shoff as purchaser of the money order. He used the money order to purchase a 1989 Mercedes. *Id*. Second, after a client invested $150,000 with Shoff by wiring the money, at Shoff's direction, into a Shoff Trading checking account, Shoff wrote a check on that account to purchase a $28,400 cashier's check payable to a local car dealer. *Id*. The cashier's check listed Shoff as the remitter. He used the cashier's check to purchase a 1992 Mercedes. *Id*.

In *Shoff* we noted that the line between money spending and money laundering is often a difficult line to draw. *Id*. We distinguished *Norman* as a case where the defendant secretly converted proceeds to personal use, and explained that Shoff's victims did not care where he initially deposited their funds. *Id*. The victims transferred the money to Shoff personally or at his direction, relying on his representation that he would invest, not on their ability to supervise or control his use of the proceeds. *Id*. We held that purchasing two cars was not equivalent to money laundering. *Id*.

In this case, Nichols's victims expected proper stewardship of their funds. He told them the funds would be deposited in a non-interest bearing account for a particular future use. The victims were not relying on Nichols to invest the funds but to hold the funds until an estate closed. As such, the money was not transferred to Nichols in his individual capacity and at his discretion. Thus, we hold that Nichols's transfer of money from the central account to different persons and gambling accounts provided sufficient proof of concealment for purposes of the money laundering statute.

E. *Venue for Money Laundering – Gomez*

Gomez, individually, contends that the United States District Court for the Western District of Missouri lacked venue over the money laundering charges filed

-17-

against him. According to Gomez, because all the facts supporting money laundering occurred in California, the district court in Missouri was not a place of proper venue. For support, Gomez relies entirely on *United States v. Cabrales*, 524 U.S. 1 (1998).

In *Cabrales*, the United States Supreme Court held that Missouri was not a place of proper venue for money laundering offenses which were begun, conducted and completed in Florida even though the sums which defendant deposited were allegedly derived from illegal narcotics activity in Missouri. As in *Cabrales*, the actual money laundering portion of Gomez's crime spree occurred wholly within the state of California. Significantly, in *Cabrales*, the Court carefully prefaced the opinion by explaining that the defendant was neither alleged to have transported funds from Missouri to Florida, nor was she charged with participation in the illegal activity in Missouri. *Cabrales*, 524 U.S. at 4. The Supreme Court approved of our pronouncement that "[m]oney laundering . . . might rank as a 'continuing offense,' triable in more than one place, if the launderer acquired the funds in one district and transported them into another." *Id.* at 8. Also, the Court was careful to explain that Cabrales was not charged with a conspiracy that would link her to the acts perpetrated in Missouri. *Id.* at 7.

In this case, Gomez was charged with causing money obtained by fraud to be transported from Missouri to California. In addition, Gomez was charged with a conspiracy linking him to fraudulent acts committed in Missouri. Gomez was convicted of interstate transportation of property stolen by fraud. As such, this case is distinguishable from *Cabrales*. We conclude that venue was proper in Missouri, a state where much of the fraud perpetrated by Gomez was initiated. *See Prosper v. United States*, 218 F.3d 883 (8th Cir. 2000) (holding that venue was proper for participation in a money-laundering conspiracy in which defendant, who had entered

a guilty plea, admitted to commission of overt acts in the jurisdiction where he was tried).[7]

## F. *Exclusion of Dr. Burgess's Testimony – Nichols*

Lastly, Nichols contends that the district court erred in excluding the testimony of his defense expert, Dr. Stanley Burgess. Nichols sought to introduce the testimony of Dr. Burgess, a professor in religious studies, concerning the religious beliefs held by members of Nichols's church. The district court ruled that Dr. Burgess's testimony was irrelevant. We review the exclusion of expert testimony for an abuse of discretion. *United States v. Rushing*, 388 F.3d 1153 (8th Cir. 2004).[8]

A district court enjoys broad discretion in its determination of relevancy and reliability of expert testimony. *United States v. Robertson*, 387 F.3d 702 (8th Cir. 2004). "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993) (quotation omitted).

---

[7]We also note that an amendment to the money laundering statute, 18 U.S.C. § 1956(i)(B), made after Gomez was indicted but before his trial, provides for venue in Missouri. Amendment to a venue statute is a procedural change applicable to suits filed prior to amendment. *See Moore v. Agency for Intern. Dev.*, 994 F.2d 874 (D.C. Cir. 1993); *Penrod Drilling Co. v. Johnson,* 414 F.2d 1217 (5th Cir. 1969). Thus, venue was also proper under the amended version of the statute.

[8]Nichols attempts to distinguish *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 (1993), as the controlling precedent by citing to *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137 (1999). However, in *Kumho,* the United States Supreme Court held that the *Daubert* "gatekeeping" obligation applies not only to "scientific" testimony, but to all expert testimony. 526 U.S. at 147.

According to Nichols, "the defense's purpose for attempting to introduce Dr. Burgess's testimony was to show the jury that Nichols was not simply professing certain religious beliefs in an attempt to win sympathy or confuse the jury." The case, however, was not about religious convictions in general or Nichols's specific religious beliefs; rather, the critical issues pertained to the elements of fraud and money laundering. The nature and sincerity of Nichols's religious beliefs was not before the court or necessary to Nichols's defense. We cannot say that the district court abused its discretion in refusing to allow Dr. Burgess's testimony.

### III. *Conclusion*

For the reasons discussed above, we affirm the conviction and sentences of Nichols and Gomez.

HEANEY, Circuit Judge, concurring.

I continue to believe that a defendant's challenge to the factual basis for a sentence enhancement preserves his Sixth Amendment sentencing claim. *See United States v. Pirani*, 406 F.3d 543, 555-62 (en banc) (Heaney, J., dissenting). Moreover, I adhere to the view stated by Judge Bye in *Pirani* that defendants who did not properly preserve their *Booker* claims in the district court are nonetheless generally entitled to resentencing under a constitutional regime. *Pirani*, 406 F.3d at 562-67 (Bye, J., dissenting). Because a majority of our court held to the contrary on both counts, however, I concur.

_____