# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-2909

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff-Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the Eastern |
| | * | District of Missouri. |
| Karen Hartstein, | * | |
| | * | |
| Defendant-Appellant. | * | |

_____

Submitted: March 13, 2007
Filed: August 27, 2007

_____

Before MELLOY, SMITH, and BENTON, Circuit Judges.

_____

MELLOY, Circuit Judge.

Karen Hartstein appeals the 135-month sentence she received after pleading guilty to two counts of a fifty-three count indictment involving credit card fraud and the solicitation of fraudulent loans from a large number of victims. Hartstein's sentence was based on a finding by the district court that her fraud involved a loss amount in excess of $2.8 million and over 180 victims. She also appeals an order to pay over $2 million in restitution to her victims. Because additional factfinding is required as to the loss amount and number of victims, we vacate the sentence and restitution order and remand for further proceedings.

I.  Background

Hartstein worked as a travel agent.  In this capacity, she solicited loans from numerous victims, promising to repay their principal within a short time period—typically thirty days—and give them free travel benefits including cruises and first-class airline tickets.  Hartstein's scheme expanded to the point where she was soliciting new loans to pay the principal on old loans in whole or in part or to purchase airline tickets to appease her prior lenders.  She eventually used clients' personal information and credit card numbers to open new lines of credit or to purchase tickets.  In addition, she left vendors or cooperating travel agents with unpaid bills and "repaid" some lenders with bad checks.  Also, as to a few clients who complained loudly, she provided one-way international tickets that she represented as round-trip tickets, thus leaving these clients stranded in foreign countries.  In one instance, the stranded traveler was a minor.  The government characterizes Hartstein's crime as a Ponzi scheme.  Hartstein characterizes her activities as borrowing that spiraled out of control in which some lenders were the victims of fraud and other lenders were friends or acquaintances who gave or loaned her money apart from any fraud.

Hartstein pleaded guilty to one count of mail fraud in violation of 18 U.S.C. § 1341, and one count of account fraud using an "access device" in violation of 18 U.S.C. § 1029(a)(2).  In a subsequently prepared presentence investigation report ("PSR"), the probation office alleged that there were over 180 victims with a combined total amount of loans and unauthorized charges over $2.8 million.  Applying the 2004 Guidelines, these figures resulted in a base offense level of seven, U.S.S.G. § 2B1.1(a)(1); an eighteen-level increase for a loss amount greater than $2.5 million but less than $7 million, U.S.S.G. § 2B1.1(b)(1)(J); and a four-level increase for more than fifty but fewer than 250 victims, U.S.S.G. § 2B1.1(b)(2)(B).  In addition, there was a two-level increase for the unauthorized use of a means of identification, U.S.S.G. § 2B1.1(b)(10)(C)(I); a two-level increase for the use of sophisticated means, U.S.S.G. § 2B1.1(b)(9)(C); and a two-level upward adjustment

for the abuse of a position of trust, U.S.S.G. § 3B1.3. This resulted in an initial PSR recommendation that the total offense level should be set at thirty-five. Hartstein had no criminal history points and was in criminal history category I. The PSR's resultant advisory Guidelines range was 168-210 months' imprisonment.

Hartstein objected to the PSR. In a detailed memorandum, she presented a series of arguments to establish that the amount of loss was substantially lower than the $2.8 million listed in the PSR. The $2.8 million figure was the total amount purportedly loaned by Hartstein to all alleged victims without reduction for amounts repaid and without reduction for travel benefits granted. Hartstein expressly challenged the factual basis of many of the loans and the characterization of certain individuals as victims. She also argued generally that she was entitled to credit against each individual loan the principal sums repaid to the associated victim and the value of travel benefits provided to that victim. Her arguments can be categorized in three separate groups, as follows.

First, Hartstein challenged the government's listing of purported losses as factually inaccurate. She asserted that many of the victims were not, in fact, victims of an interrelated Ponzi scheme as alleged by the government, but were (1) friends or relatives who loaned or gave her money out of kindness, or (2) lenders who were unrelated to an alleged scheme. She also asserted that the government's listing of loss amounts for several victims was inaccurate, redundant, or not supported by the evidence. For example, Hartstein alleged that some victims were listed separately from their spouses and that the total losses to the couples were counted twice even though the couples only loaned Hartstein money once. Hartstein argued that the elimination of the challenged victims and their purported losses, and the correction of

inaccurate accounting by the government, would reduce the total loss amount by approximately $600,000.[1]

Second, Hartstein asserted that she repaid substantial sums to many of her victims/lenders and that the amounts repaid should be credited against the loss amount. According to Hartstein, this argument, if accepted by the court, would reduce the total loss amount by approximately an additional $1 million. Hartstein essentially argued that the proper amount for loss calculations was not the total amount loaned by each victim, but the net loss of principal by each victim.

Finally, Hartstein asserted that the value of travel benefits (cruises, plane tickets, etc.) she provided to her victims in lieu of or in addition to principal repayments should be used to offset the loss amounts by an additional sum of approximately $300,000.

Based on these three categories of arguments—the fact-based challenges, the repayment credit theory, and the travel benefit theory—Hartstein provided a detailed,

---

[1]Our review of summaries provided by Hartstein and government suggests that Hartstein identified approximately thirty purported victims on the government's list of victims that she argued were not victims or that had loaned her money in amounts less than the amount claimed by the government. For example, the government's list included a pawn shop and a ticket broker who were claiming an entitlement to money but who did not appear to be victims of the fraud as alleged by the government. Also, at least one of the purported victims signed an affidavit indicating that he was not a victim of fraud, was not seeking restitution, and had loaned money to Hartstein out of friendship. Hartstein also listed approximately sixteen purported victims that she claimed loaned her *more* money than stated by the government. The net result of these alleged overstatements and understatements of loan amounts and victims by the government would have reduced the total loss amount by approximately $560,000 rather than the $600,000 asserted by Hartstein. This dollar amount is independent of Hartstein's other arguments regarding credit for the repayment of loan amounts or credit for the provision of travel benefits to the victims or purported victims.

victim-by-victim summary of her position which she labeled "Defendant's Victim List." This list was based on the government's summary of its own position, and the list detailed purported victims' names, loan amounts, repayments, travel benefits, and the net amount still owed to each victim.[2] Defendant's Victim List also included a brief explanation following each victim to explain why, in many cases, the loan amounts differed from those claimed by the government or why Hartstein considered the lender not to be a victim.

The government responded to Hartstein's objections, and the probation office issued amendments and comments to the PSR, noting repeatedly that the government was prepared to offer documents and testimony at sentencing to support the asserted loss amounts. Prior to sentencing, Hartstein conducted additional investigation, and shortly before sentencing, she provided the court and the government with an amended, detailed summary of her position regarding loss amounts. In this amended summary, Hartstein listed the total loss amount as $970,000. Hartstein argued at sentencing that she should be sentenced based on this loss amount.

At sentencing, the government argued that the friends and relatives Hartstein sought to eliminate from the list of victims, and whose losses Hartstein sought to eliminate from the loss totals, were, in fact, victims of fraud notwithstanding their personal relationships with Hartstein. As to one of these individuals, the government noted that, even though Hartstein characterized the person as having loaned money as a display of love and affection, the person received a promissory note from Hartstein that was identical to notes received by other victims. The government

_____

[2]Hartstein argued at sentencing that the Defendant's Victim List "includes all victims who suffered actual losses and are owed restitution. This list also included the amounts each victim loaned to Hartstein, the amounts of any repayment and travel amounts, and loss amounts for each victim. There are 112 victims with losses totaling $914,885.06." This was in contrast to the government's position, as reflected in the PSR, that there were over 180 victims with a total loss in excess of $2.8 million.

argued categorically that all of the identified lenders were victims of a Ponzi scheme and that individual factual findings were not necessary as to each victim. The district court agreed, found Hartstein non-credible and declined the government's offer to submit evidence to prove the loss amounts.

Regarding repayments, the government alleged generally that Hartstein's scheme was a Ponzi scheme in which she paid or partially paid early lenders with money received from subsequent lenders to assuage the earlier lenders' worries or to gain their confidence so that they would increase their own lending activities or send other potential lenders to her. Based on this argument, the government asserted that, as a matter of law, all of Hartstein's repayments to purported victims were merely instruments to perpetuate her fraud, and it would be improper to decrease the total loss amount by any sums that Hartstein repaid to the alleged victims. The government also argued that it was improper to credit against losses the value of travel benefits provided to the victims because the government had not attempted to include the value of promised travel benefits in the initial loss amounts. The government also noted that Hartstein had promised travel to her victims in addition to, not in lieu of, the return of their principal and that the goal in calculating loss amounts is not to enforce the terms of a fraudulently procured contract, but to identify the amount of the loss.

In effect, the government urged a categorical approach for the treatment of Hartstein's objections, relying on legal arguments to defeat Hartstein's challenges in the aggregate rather than focusing on specific loss amounts for each victim. The government also, however, selected certain victims as examples and addressed loss amounts related to these victims that Hartstein claimed to have repaid or repaid in part. As to some of these particular victims, the government argued that Hartstein had, in fact, repaid them with bad checks or had not actually repaid them at all.

At sentencing, the government presented no evidence to prove the loss amounts. Rather, Hartstein and the government relied upon accounting summaries indicating

their respective positions. The district court accepted the government's legal arguments, discussed the summaries, found Hartstein's summary to be inaccurate or non-credible as to certain victims who were selected as examples, and rejected all of Hartstein's arguments. Although the sentencing hearing did not involve the presentation of evidence as to loss amounts, a number of witnesses testified as to other issues. For example, a postal inspector testified as to some financial matters relevant to the question of whether Hartstein derived her means of living from the criminal activity. A victim testified as to a large loan she made to Hartstein and as to Hartstein's use of the victim's name to open credit accounts. Mental health professionals provided testimony relevant to claims by Hartstein that she committed her offense while laboring under a diminished mental capacity. U.S.S.G. § 5K2.13.

The district court found that Hartstein did not suffer any mental impairments that qualified for a departure under the Guidelines. The district court adopted the PSR recommendations except that the district court granted Hartstein a two-level reduction for acceptance of responsibility and refused to apply a two-level enhancement for abuse of a position of trust. This resulted in a total offense level of thirty-one, criminal history category I, and an advisory Guidelines range of 108-135 months' imprisonment. The parties both agreed that, given the court's other findings as to the contested matters, this final calculation was accurate. The court then considered the other relevant sentencing factors under 18 U.S.C. § 3553(a) and sentenced Hartstein to the high end of the advisory range, 135 months' imprisonment. Finally, the court adopted the PSR recommendations as to amounts owed as restitution.

On appeal, Hartstein renews her three arguments and, in addition, argues generally that the district court failed to properly allocate the burden of proof at sentencing and failed to require the government to present evidence as to challenged factual assertions.

## II. Discussion

### A. Standard of Review and General Framework

We review a district court's interpretation of the Guidelines de novo and its findings of fact for clear error. United States v. Holthaus, 486 F.3d 451, 454 (8th Cir. 2007). Although a district court must make factual findings for Guidelines purposes by a preponderance of the evidence, id. at 453 n.2, "the damage wrought by fraud is sometimes difficult to calculate, so a district court is charged with the difficult task of making a reasonable estimate of . . . loss rather than a precise determination." United States v. Agboola, 417 F.3d 860, 870 (8th Cir. 2005); see U.S.S.G. § 2B1.1, comment. (n.3(C)) (stating that the sentencing court "need only make a reasonable estimate of the loss"). Further, "[t]he sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence. For this reason, the court's loss determination is entitled to appropriate deference." Id. Combining the Guidelines' application notes with our established standard, the sentencing court must establish a reasonable estimate of the loss based upon a preponderance of the evidence. Determination of the method for calculating a loss amount, however, remains a legal issue that we review de novo. See United States v. Alfonso, 479 F.3d 570, 572-74 (8th Cir. 2007) (applying de novo review to an issue of loss-calculation methodology). Also, to the extent factual findings are not based on an examination of testimony or other evidence, no deference is due.

Guidelines sections 2B1.1(b)(1)(I) to (K) provide for sixteen, eighteen, and twenty-level increases, respectively, if the total loss amounts are more than $1 million, more than $2.5 million, or more than $7 million. In the present case, we would have to accept all three of Hartstein's general categories of arguments in their entirety to find that the $970,000 loss amount advocated by Hartstein is appropriate. One of Hartstein's arguments, however, is without merit and demands little discussion: the argument regarding credits for travel benefits paid to victims. On the facts of the

present case, the travel benefits were akin to interest that Hartstein promised to her lenders. The government did not seek to include the value of promised travel benefits in the initial loss figures, and the payment of travel benefits did not in any manner restore to the victims the sums they had loaned to Hartstein.

Hartstein's concession that the overall loss amount should be in the range of $970,000 was based on her partial agreement with the government's accounting as to the original loan amounts. She does not challenge the factual basis of approximately $2.2 million of the government's asserted $2.8 loan amount figure. Her other arguments regarding repayments and travel benefits account for the difference between this $2.2 million figure and her overall asserted loss amount of $970,000. Rejection of her travel benefits argument, then, effectively adds $300,000 to Hartstein's conceded loss amount and places it well above the threshold of $1 million found in U.S.S.G. § 2B1.1(b)(1)(I), even if Hartstein were to prevail on all of her other arguments.

Given this fact, the loss calculations at hand are material to the Guidelines calculations due to the additional two-level increase that is imposed at the level of a $2.5 million loss. If Hartstein's remaining arguments—her purely factual challenges and her legal arguments regarding credits for repayments—together or independently result in an overall loss amount less than $2.5 million, Hartstein's total offense level would be twenty-nine rather than thirty-one, and her advisory Guidelines range would be 87-108 months rather than 108-135 months. We address these two remaining arguments in turn.

B. Factual Challenges

As indicated *supra* at note 1, Hartstein's purely factual challenges, if sustained in full, would eliminate approximately $560,000 from the total asserted loss amount. This challenge, then, could place the loss amount under the Guidelines threshold of $2.5 million and change the advisory Guidelines range. We hold that remand is necessary in this case because Hartstein objected to the method of calculation used in the PSR as well as the resultant loss figures, but the government presented no evidence tending to prove the challenged figures. "'If the defendant objects to any of the factual allegations contained [in the PSR] . . . , the government must present evidence at the sentencing hearing to prove the existence of the disputed facts.'" United States v. Jenners, 473 F.3d 894, 897-98 (8th Cir. 2007) (quoting United States v. Poor Bear, 359 F.3d 1038, 1041 (8th Cir. 2004)).

The government did present summary tables of its position regarding an accounting of the fraudulent loans. Summary tables of accounting data that are based on evidence not before the court, and that a party has challenged as inaccurate, are not sufficient to support a court's factual findings. United States v. Green, 428 F.3d 1131, 1134 (8th Cir. 2005) ("[T]he charts may 'include assumptions and conclusions, but said assumptions and conclusions must be based upon evidence in the record.'") (quoting United States v. Wainwright, 351 F.3d 816, 821 (8th Cir. 2003)). When challenged, the conclusions and assumptions stated in summary accounting data are not evidence in and of themselves, but are more akin to representations by litigants.

On remand, Hartstein will not be able to avoid her previous concessions, but she will be entitled to put the government to its burden of proof regarding the challenged loan amounts and the circumstances surrounding the lenders she alleges were not victims of fraud. The government need not present evidence as to each alleged victim, as Hartstein challenges neither the characterization of many of her lenders as victims nor the loan amounts claimed by the government as to many of

-10-

these victims. Where the parties' figures are not in agreement, however, and where Hartstein claims a lender was not, in fact, a victim of fraud, the government must prove the loan amount and present evidence as to the circumstances surrounding the particular loan.

The government argues that Hartstein waived her ability to challenge the evidentiary basis of the district court's ruling by not sufficiently pressing the court to demand evidence from the government. In this regard, we note that, at one point during the sentencing hearing, Hartstein's counsel appeared to waive a detailed victim-by-victim examination, stating to the court, "I'm happy to go in detail through these, but I don't know that it's necessary at this point." We find the record confusing in this regard, and we agree with the government to the extent it claims Hartstein's counsel could have more clearly and forcefully preserved her evidentiary challenge. We are convinced, however, that by the time Harstein's counsel made the above-quoted statement, the proceeding had evolved to the point where the burden clearly and improperly, even if inadvertently, had shifted to the defendant to disprove the loss amounts asserted by the government. This shifting of the burden was improper. Although Hartstein proceeded at sentencing as though she needed to chip away at the government's final loss amount calculation, it was not her burden to disprove the final loss amount.

Because the burden should never have been shifted in this manner, we are not inclined to penalize Hartstein for not raising her evidentiary challenges more clearly or more vigorously. In short, Hartstein's concessions established a much lower loss amount than that claimed by the government. It was the government's burden to present evidence to prove a loss amount greater than Hartstein's concession. It was not Hartstein's burden to present evidence in an attempt to chip away, victim-by-victim, from the government's unproven claims.

At resentencing, it is possible that the government will present evidence sufficient to defeat Hartstein's factual challenges. As such, it is possible that the district court will find that the total amount of fraudulent loans exceeds the $2.5 million threshold. Therefore, it remains necessary to address Hartstein's argument regarding credit for repayments.

C. Credit for Repayments

i. Fraudulent Investment Schemes, Generally

In the context of fraudulent loans or investments, it is often difficult to determine the appropriate method for calculating loss and the appropriate treatment of repayments. The parties in this case spend a good deal of effort attempting to convince us that the present crime and related conduct was or was not a Ponzi scheme based on the assumption that the general label "Ponzi scheme" concludes our analysis and is determinative as to whether repayments of principal should be credited against the victims' loan amounts. The government's theory is that, within a Ponzi scheme, the organizer of the scheme pays out principal, and possibly profit, to some victims as a means of garnering further investment, goodwill, or the referral of new victims. Alternatively, such payments may be used to grease squeaky wheels, effectively silencing victims who complain loudly and threaten to expose the scheme to investors or authorities.

We believe the parties' focus on the label "Ponzi scheme" is misplaced for two reasons. First, it is not clear that all the numerous victims in the present case were similarly situated or were victims of the same overarching fraudulent scheme. Accordingly, it is not clear that all the victims should be treated identically in relation to the crediting of repayments against losses. Second, Ponzi schemes come in many shapes and sizes and we believe it is more appropriate to apply a nuanced approach that takes into consideration the facts of the fraud at issue. Such an approach should

focus on a defendant's intent rather than make sentencing variations turn on the application of a label as vague as "Ponzi scheme."

The nature of the particular fraudulent scheme in any given case may provide great insight as to a defendant's intent. Ultimately, it is that intent, rather than assumptions about Ponzi schemes, that should control under the Guidelines, which expressly call for sentencing based on the "greater of actual loss or intended loss." U.S.S.G. § 2B1.1, comment. (n.3(A)). Because actual loss normally includes credit for repayments received prior to discovery of the crime,[3] it is intended loss rather than actual loss that typically is the focus of a sentencing court's inquiry when a court considers whether to grant credit for repayments. Because we have repeatedly characterized intended loss with reference to a defendant's actual, subjective intent, that intent should drive our analysis. See Holthaus, 486 F.3d at 456 ("[T]he district court determined [the defendant's] subjective intent based on the available evidence."); United States v. Wheeldon, 313 F.3d 1070, 1072 n.2 (8th Cir. 2002) ("His subjective intention is to produce a certain loss . . . .").

This focus on intent to determine the proper treatment for repayments of principal in the context of fraudulent schemes is consistent with the application notes and with our prior statements about Ponzi schemes. While the general term "Ponzi scheme" refers to various configurations of investment schemes in which one victim's funds are used to pay, appease, or further entice the same victim or additional victims, the term is in such wide use in such diverse settings as to be of little practical assistance. The Guidelines themselves, in application note 3(F)(iv) to section 2B1.1,

---

[3]Actual loss typically is a net figure that looks at a victim's actual pecuniary harm resulting from the conduct, i.e., the difference between what the victim paid and what the victim recovered plus any other forms of "reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1 comment. (n.3(A)(i)). As a general rule, repayments prior to discovery are credited against loss. Id. § 2B1.1 comment. (n.3(E)(i)).

use the term "Ponzi scheme" as an illustrative example of a "fraudulent investment scheme." This application note does not define "Ponzi scheme," however, nor does it instruct courts as to whether credit should be given for pre-discovery repayments of principal to victims. Rather, it provides only that "the *gain* to an individual investor in the scheme shall not be used to offset the loss to another individual investor." Id. (emphasis added); compare id. (regarding non-credit for gains "in excess of that investor's principal investment") with U.S.S.G. § 2B1.1, comment. (n.3(E)) (providing generally that pre-discovery repayments should be credited against losses).

In a recent case, we examined the purpose of application note 3(F)(iv), and held that it also precludes the offsetting of one victim's earlier gains or profits against that same victim's own later losses. See Alfonso, 479 F.3d at 573 ("[W]e conclude that the district court properly declined to offset victims' gains on one investment against their losses on subsequent investments."). Our rationale in Alfonso was that, because the defendant's presumed purposes or subjective intentions in paying earlier gains were to solicit good will and garner further investment, he should not receive credit for the payments of gains whether made to the same victim or a different victim. Id.[4]

_____

[4]The treatment of principal repayments was not the issue before the court in Alfonso. Rather, the question before the court was how to treat the payment of gains. In Alfonso, one of the victims loaned at total of $301,000 to the defendant. Alfonso, 479 F.3d at 571 n.3. The defendant apparently repaid a principal amount of $36,000 from a first loan along with $8000 in gains. Id. The same victim then loaned the defendant an additional $265,000, of which only $110,000 in principal was repaid. Id. Under the government's theory of no credit for repayments, as asserted in the present case, the amount of loss in Alfonso would have been $301,000, the total amount loaned without credit for principal or gains paid to the victim. That approach was not used by the court in Alfonso. Rather, the court applied note 3(F)(iv) to section 2B1.1, refused to give credit for the $8000 of gains paid to the victim, but gave credit for the return of $147,000 of principal. Id. at 571 n.3 and 572-73.

-14-

In neither Alfonso nor any other case have we interpreted the Guidelines as precluding credit against losses for repayments of principal merely because a fraud occurred within the context of a larger scheme or Ponzi scheme. In fact, in Alfonso the sentencing court had given credit for repayments of principal in the context of a fraudulent scheme, and we affirmed the sentence. See id. at 571 n.3 and 572-73 (setting forth calculations for a particular victim, denying credit for $8000 of earlier profits, but granting credit for $147,000 of repaid principal). We also discussed this issue in a footnote in United States v. Nichols, 416 F.3d 811, 820 n.6 (8th Cir. 2005), but we ultimately held that, on the facts of Nichols, credit for repayments would not have made a difference in the Guidelines calculations. Id. at 820-21. Our authority, then, does not categorically preclude the treatment that Hartstein requests.

As noted in Nichols, many other circuits have gone further and held explicitly that repayments of investment or loan principal should not be credited against losses in the context of investment schemes where a defendant merely uses such repayments (1) to build investors' confidence thereby luring further investment, or (2) to appease noisy victims in order to avoid exposure of the scheme. See, e.g., United States v. Deavours, 219 F.3d 400, 403 (5th Cir. 2000) ("[The] defendants returned money to those they had defrauded, not to compensate the victims for their losses . . . but conversely to extend their criminal activities and the profitability thereof—and to place yet more property of innocent victims at risk."); United States v. Loayza, 107 F.3d 257, 266 (4th Cir. 1997); United States v. Carrozzella, 105 F.3d 796, 805 (2d Cir. 1997) ("One reason for this rule is that . . . the return of money as interest or other income is often necessary for the scheme to continue.") (abrogated on other grounds by United States v. Kennedy, 233 F.3d 157, 160-61 (2d Cir. 2000)). The holdings in these cases appear to be based on general assumptions about defendants' purposes and intentions in operating investment schemes. In fact, in at least one of these cases, the court explicitly directed its attention not only at the general topic of Ponzi schemes, but specifically at the question of the defendant's intent, and what the nature of such schemes reveal about that intent. See Loayza, 107 F.3d at 266 ("This approach which

holds a defendant responsible for the amount of loss which was intended, not the actual loss ultimately sustained, is appropriate in cases where the repayments are vital to the longevity of the scheme.").

Ultimately, we believe a focus on intent in each case is a prudent course to follow. Because the Guidelines do not define the term "Ponzi scheme," we believe it is more helpful to return to the Guidelines' basic definitions for actual and intended loss and view loss amounts related to fraudulent investment schemes from the standpoint of these basic definitions. U.S.S.G. § 2B1.1(b)(1), comment. (n.3(A)(i)) ("'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense."); id. comment. (n.(3)(A)(ii)) ("'Intended loss' . . . means the pecuniary harm that was intended to result from the offense . . . and . . . includes intended pecuniary harm that would have been impossible or unlikely to occur."). These basic definitions provide a framework within which section 2B1.1 application note 3(F)(iv) (regarding fraudulent schemes) and application note 3(E) (regarding credit for repayments) can be fully understood not as stand-alone rules for application only in the context of "Ponzi schemes," but as necessary extensions of the basic definitions of actual loss and intended loss. In the present case, as in most cases involving an alleged Ponzi scheme, the particulars of the fraud will inform the sentencing court as to the defendant's intent.

In the present case, Hartstein's concessions as to numerous victims suffice to demonstrate that, at least as to several victims, she borrowed money she knew she could not repay but for the false and misplaced hope that she could perpetuate her fraud indefinitely. See, e.g., United States v. Lauer, 148 F.3d 766, 767 (7th Cir. 1998) ("But it is the same sense in which the author of a Ponzi scheme might not intend that any of his investors lose anything–might intend that the scheme continue until the end of the world, in which event there would be no losers."). We believe that when a defendant's only subjective intent regarding repayments relates to this illegal purpose of perpetuating the scheme, a sentencing court may refuse to credit repayments against

sums received from the victims. Still, Hartstein's limited concessions do not relieve the government of its burden of proof in this case. As to the victims where Hartstein has lodged objections and where further factual findings are required, it is also necessary to hear evidence tending to show the conditions under which Hartstein received money from the victims and to determine whether different circumstances require different treatment for repayments. If the government fails to meet its burden of proof regarding the defendant's intent as to any particular victim or group of victims, it may be necessary to rely on the amount of the actual loss (principal that was not repaid).

III. Conclusion

Finally, Hartstein challenges the district court's application of enhancements under the Guidelines for use of sophisticated means and unauthorized use of a means of identification. She also argues that the restitution order involved a violation of United States v. Booker, 453 U.S. 220 (2005), and that the district court committed clear error regarding its findings as to Hartstein's mental health. We find these arguments to be without merit. We have previously held that restitution orders do not raise Booker concerns. United States v. Carruth, 418 F.3d 900, 904 (8th Cir. 2005). Further, the district court's findings as to the challenged enhancements and mental health issues were well-supported by the evidence presented during sentencing and were not clearly erroneous.

For the foregoing reasons, however, we vacate the sentence and restitution order and remand for the presentation of evidence relevant to loss amounts, further factfinding, and resentencing. We note that, on remand, the district court need not ignore Hartstein's prior concessions as to loss amounts. By our account, without credit for the payment of travel benefits, these concessions place the loss amount well in excess of $1 million, see U.S.S.G. § 2B1.1(b)(1)(I), but possibly below $2.5 million, see U.S.S.G. § 2B1.1(b)(1)(J).

_____