# United States Court of Appeals
## For the Eighth Circuit

_____

No. 13-3217
_____

United States of America

*Plaintiff - Appellee*

v.

Rodney W. Callaway

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Western District of Arkansas - Fayetteville

_____

Submitted: June 13, 2014
Filed: August 8, 2014

_____

Before MURPHY, COLLOTON, and KELLY, Circuit Judges.

_____

MURPHY, Circuit Judge

Rodney Callaway was convicted of ten counts of wire fraud and one count of mail fraud for obtaining from his disabled cousin some $300,000 through a fraudulent scheme. The district court[1] sentenced Callaway to 71 months imprisonment and imposed a $25,000 fine. Callaway appeals. We affirm.

_____

[1]The Honorable Jimm Larry Hendren, United States District Judge for the Western District of Arkansas.

I.

Rodney Callaway was charged in October 2012 with ten counts of wire fraud and one count of mail fraud for defrauding his cousin Irene Bryant of $300,000 she had received from a negligence and abuse suit against a nursing home. A trial was held in January and February 2013, which established the following record.

Callaway was contacted in June 2005 by his first cousin, Sharon Carter, who sought his advice on investing $300,000 in settlement money her sister, Irene Bryant, had received in a negligence and abuse suit against a nursing home. Carter had begun caring for the sister and had obtained power of attorney to handle her affairs after Bryant suffered a massive stroke in 2002 which paralyzed her on the right side. In addition to paralysis, Bryant suffers from deafness and expressive aphasia, a condition which makes her unable to speak despite knowing what she wants to say. Carter worried that the $300,000 would not pay for all of the care Bryant would need. She contacted Callaway for investment advice both because he was a family member and because he had told her he was an experienced, successful asset manager. Callaway did in fact own and control a Georgia investment firm, Heritage Corner Ltd.

Callaway advised Carter to loan Bryant's money to the Environmental Protection of Asia Foundation, a charitable humanitarian and environmental organization. He claimed he was a trustee of the foundation and a business partner of its chairman, whom he claimed he met while performing military service in Vietnam. Callaway promised Carter a 12% return on the loan, which could be received as a payment or reinvested in the foundation on June 30, the end of the foundation's fiscal year. He also promised that funds could be withdrawn in any amount at any time upon 30 days notice. Callaway assured Carter that his own money was invested in the account and that Bryant's funds would "piggyback" onto his own. Carter decided to follow Callaway's advice. After signing an agreement Callaway faxed to her, she wired $300,000 from Bryant's account in Arkansas to the Heritage Corner account in Georgia. Callaway did not lend the money to the foundation as promised, however,

-2-

but converted it to his own personal use, primarily by paying the balances due on his credit cards.

In June 2006 Callaway sent a $36,000 payment to Bryant, falsely representing that it was interest earned on the $300,000 she gave him to invest in the foundation. Carter later contacted Callaway in December about an early withdrawal of the funds, but Callaway put her off, indicating that he did not want to think about business over the holidays. When Carter again approached Callaway about an early withdrawal in early January 2007, he told her that he would face a huge penalty if her funds were withdrawn because they were piggybacked with his. Carter decided to wait until the end of fiscal year disbursement and called Callaway at the end of June to verify that Bryant would receive a $36,000 interest payment as promised. Although Callaway indicated there would be a delay, he confirmed that the funds would be sent in a few days. After a month passed without a payment, Carter told Callaway the money was needed for Bryant's care. Callaway sent Bryant $5,000 on August 2, promising that the rest of the funds would also arrive soon.

After Callaway failed to send Carter the remaining $31,000 he promised, Carter informed him in a September 4 email that the Medicare Recovery Unit was demanding payment for Bryant's care. She told him that if he did not send the payment by September 21, she would refer the matter to an attorney. She also sent Callaway a letter the same day requesting reimbursement of all funds with interest from July 2006. Callaway claimed in a reply email that he would pay her $50,000 on September 21 and the remaining funds on or after October 2. He again failed to make any payments, however.

Carter began to call Callaway every week from October 2007 to September 2009 seeking funds. At first Callaway only made promises and excuses for missed deadlines. Then in November 2007 he sent Bryant $5,000 after Carter told him it was desperately needed to pay Bryant's medical expenses. He sent another $1,000 in December after Carter told him Bryant had suffered a stress fracture and needed to

buy a brace. In February 2008 he sent $1,500 to pay for dental care to Bryant's broken tooth and then $5,300 more for dental work as well as Bryant's rent after Carter was delinquent on her mortgage payment. Callaway then sent $50,000 in April for Bryant's medicare bill and $25,000 in July 2008 for her hospital bill when he learned that Bryant would be sued if her delinquent accounts were not paid.

Carter filed complaints against Callaway with the Georgia Securities Department in the Fall of 2008 and with the Arkansas Securities Department, the IRS, the SEC, and the FBI in 2009. Callaway sent Carter a $10,000 check in June 2009 in response to her warning that it was necessary to keep Bryant in her assisted living home. As late as November 2009 Callaway continued to make false statements purportedly explaining why he was unable to return all of Bryant's funds.

In February 2013, Callaway was represented at trial by a federal public defender, and a jury found him guilty of ten counts of wire fraud and one count of mail fraud. The presentence report stated that Callaway had told an FBI special agent that he stopped making payments to Carter because he believed she was using the money to send her "spoiled grandson" to college rather than to provide for Bryant's care. Carter declared in her victim impact statement that her grandson had in fact postponed going to college in order to help her care for Bryant after Callaway failed to reimburse Bryant. Callaway also told the special agent that he had incurred much of his credit card debt by charging trips he made to the Philippines on behalf of the Environmental Protection of Asia Foundation. He explained that he believed keeping Bryant's money instead of loaning it to the foundation was apparent return for his uncompensated efforts on the foundation's behalf.

Callaway's presentence report identified a base offense level of 7. It added 12 levels for the total loss amount, which it determined to be $300,000 based on the "total amount of loan funds fraudulently diverted." It added another 2 levels because Callaway had represented to Bryant that he worked for the Environmental Protection of Asia Foundation, a charitable organization. Although it recommended no

-4-

adjustment for an offense involving a vulnerable victim, it recommended a 2 level enhancement for abuse of a position of trust. The final offense level calculated in the report was 23. The government objected that a 2 level enhancement for victim vulnerability should be applied under United States Sentencing Guideline § 3A1.1(b)(1). Callaway objected to the abuse of trust enhancement, but not the calculated amount of loss.

The presentence report also indicated that the fine range for Callaway's offense was $10,000 to $100,000. Callaway's assets were listed at just over $150,000 and his liabilities at $1.54 million, including nearly $1.3 million in civil judgments stemming from his fraud. His income from retirement, social security, and military disability is $4873 a month, a few hundred dollars more than his expenses. The report concluded that "[i]t is believed he can make payments toward a fine and restitution as he is capable of working and earning an income." After noting Callaway's declaration that he would lose his social security and military disability benefits if he were incarcerated, the report stated that "[i]f incarcerated, defendant could work and make payments toward a fine/restitution through the Bureau of Prisons Inmate Financial Responsibility Program."

Callaway was sentenced in August 2013. The parties agreed at the sentencing hearing on a restitution amount of $228,582. The government argued for a vulnerability enhancement on the basis that Callaway knew Bryant was vulnerable and relied on others to protect her interests. Callaway objected that Bryant's interests were being protected by Carter, who had experience in the nursing home business and ran her own bed and breakfast. He contended that with Bryant's power of attorney, Carter had a fiduciary duty to manage her funds. The district court found that Callaway knew that Bryant was vulnerable and that she relied on the funds he had taken from her, adding that Callaway also knew the funds had come from a lawsuit over neglect Bryant had suffered at a nursing home. It rejected Callaway's argument that Carter's involvement shielded him from the vulnerable victim enhancement. The district court also rejected Callaway's argument that he had not abused a position of trust when

carrying out the fraud, finding that he had held himself out to Carter as a business consultant and asset manager.

The district court added 2 levels for a vulnerable victim to Callaway's offense level, bringing the total to 25. Given a criminal history category of I, the resulting guideline range for sentencing was 57 to 71 months imprisonment, while the fine range was $10,000 to $100,000. The government asserted that an upward variance from this range was appropriate because of the serious harm Callaway had caused. Callaway sought a downward variance, citing his heart condition, diabetes, and high blood pressure, as well as his history of decorated military service. Callaway also asked the court not to impose a fine. He noted that he was already obliged to pay restitution as well as civil judgments and that much of his limited income would be lost during his incarceration.

The district court sentenced Callaway to 71 months for each of the 11 counts, to be served concurrently, and imposed a $25,000 fine over his objection. The district court noted Bryant's need for the funds and the fact that Callaway should have returned them immediately but did not. It considered Callaway's health problems and military service but found that the former were ordinary for a person his age and controlled by medication. While his military service was honorable, it did not "give [him] a pass to steal and defraud helpless women." The court pointed out that the fine was at the low end of the recommended range and that there was no reason why Callaway could not return to earning "relatively large sums of money" in the future. Callaway appeals his sentence, challenging both its procedural and substantive reasonableness.

II.

Sentences are reviewed first for procedural error and then for substantive reasonableness. United States v. Dengler, 695 F.3d 736, 739 (8th Cir. 2012). When analyzing a sentence for procedural error, we review a district court's interpretation

-6-

and application of the guidelines de novo and its factual findings, including its calculation of loss amounts, for clear error. Id.; see also United States v. Jenkins-Watts, 574 F.3d 950, 961 (8th Cir. 2009). Procedural errors not objected to at sentencing are reviewed for plain error, however. United States v. Rice, 699 F.3d 1043, 1049 (8th Cir. 2012). To establish plain error a defendant must show an error that is plain and that affects substantial rights. Id. We have discretion to correct plain error "'only if it seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" Id. (quoting United States v. Phelps, 536 F.3d 862, 865 (8th Cir. 2008)).

Callaway asserts that the district court committed procedural error by applying a 12 level enhancement for the total loss amount. He contends the court should have credited over $100,000 repaid to Bryant against the loss amount, reducing the total loss to $197,200 that would have resulted in an enhancement of 10 levels rather than 12. Because Callaway failed to object at sentencing to the district court's loss calculation, we review it for plain error. See Rice, 699 F.3d at 1049.

The guidelines instruct that loss amount "is the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. 3(A). Actual loss is the "reasonably foreseeable pecuniary harm that resulted from the offense," while intended loss is "the pecuniary harm that was intended to result." Id. cmt. 3(A)(i)–(ii). Sentencing courts have typically focused on intended loss rather than actual loss because "actual loss normally includes credit for repayments received prior to discovery of the crime." United States v. Hartstein, 500 F.3d 790, 798 (8th Cir. 2007). Intended loss is based on "a defendant's actual, subjective intent," id., but is not to be confused with "good intentions." The Seventh Circuit has pointed out that while "the author of a Ponzi scheme might not intend that any of his investors lose anything . . . [and] that the scheme [would] continue until the end of the world," that does not excuse his fraud. United States v. Lauer, 148 F.3d 766, 767 (7th Cir. 1998). We have agreed, concluding that "when a defendant's only subjective intent regarding payments relates to [the] illegal purpose of perpetuating the [fraudulent] scheme, a sentencing court

may refuse to credit repayments against sums received from the victims." Hartstein, 500 F.3d at 800 (citing Lauer, 148 F.3d at 767).

The record shows that Callaway intended to defraud Bryant of the full $300,000 he took from her and that any payments he made to her were intended to keep Carter from discovering the fraud. Callaway sent the first $36,000 to Carter under the pretext that it was an interest payment promised under the agreement, an act that was necessary to give his scheme a veneer of legitimacy. He sent the next payment more than a year later, after Carter told him it was critically necessary for Bryant's care. He made subsequent payments only after Carter's September 4, 2007 letter threatening to contact an attorney if he did not meet his payment obligations. Even then, he paid only when repeatedly confronted with Bryant's desperate medical needs or threats of legal action by third parties, either of which could have foreseeably led to discovery of the scheme. In addition, Callaway showed no remorse in his interview with a special agent, telling him he had taken Bryant's money to "pay himself back" for contributions he allegedly made to the same foundation in which he had promised to invest Bryant's money and also accusing Carter of spending the money on her "brat" of a grandson. On this record, we conclude that the district court did not err in calculating the loss amount at $300,000 or in applying a 12 level increase for it.

Callaway also asserts that the district court committed procedural error by applying the 2 level vulnerable victim penalty. A 2 level enhancement for a vulnerable victim is appropriate "if the defendant knew or should have known that a victim of the offense was a vulnerable victim." U.S.S.G. § 3A1.1(b)(1). A vulnerable victim is "a person (A) who is a victim of the offense . . . and (B) who is unusually vulnerable due to age, [or] physical or mental condition." Id. cmt. 2. Callaway argues that the vulnerable victim enhancement is inappropriate in his case because the government failed to prove that a "nexus" existed between Bryant's vulnerability and his crime's success. He asserts that no such nexus could be proven because he had not targeted Bryant and because Carter had represented her financial interests. The Sentencing Commission has eliminated the nexus requirement, however, by amending

§ 3A1.1 and striking a note requiring that the defendant have targeted his victim because of her vulnerability. See United States v. Anderson, 349 F.3d 568, 572 (8th Cir. 2003). The government need only to show that Callaway "knew or should have known of [Bryant's] unusual vulnerability.'" Id.

The record amply demonstrates Bryant's unusual vulnerability. She is deaf, paralyzed on the right side by a stroke, unable to speak despite knowing what she wants to say, unable to live by herself, and dependant on paid care provided by a nursing home. In fact, this case arose because Bryant needed to invest settlement money from her negligence suit against a nursing home to provide for her future care. The fact that she had to turn to her sister to make an investment and to collect on it is further evidence of her need to rely on others for basic care. Callaway became aware of her vulnerability when Carter approached him for advice on investments that would pay for her sister's care. Callaway also knew that Bryant was growing increasingly vulnerable because he had taken for himself the money she had entrusted to him for that purpose. It is thus plain from the record that Callaway knew of Bryant's unusual vulnerability, and the district court did not err in applying a 2 level enhancement for victim vulnerability.

Callaway argues that his prison sentence at the highest end of the guideline range was substantively unreasonable because the court gave too much weight to the nature and circumstances of the offense and not enough to his history and characteristics or to the limits imprisonment would place on his ability to pay restitution. Substantive reasonableness is reviewed "'under an abuse-of-discretion standard.'" Dengler, 695 F.3d at 739 (quoting Gall v. United States, 552 U.S. 38, 51 (2007)). We evaluate the "substantive reasonableness of [a] sentence with reference to the factors enumerated in 18 U.S.C. § 3553(a)." United States v. Zauner, 688 F.3d 426, 429 (8th Cir. 2012) (internal quotation marks omitted). A sentence which falls within the guideline range is presumed to be reasonable, and district courts are allowed "'wide latitude to weigh the § 3553(a) factors in each case and assign some factors greater weight than others in determining an appropriate sentence.'" United

States v. Maxwell, 664 F.3d 240, 247 (8th Cir. 2011) (quoting United States v. Bridges, 569 F.3d 374, 379 (8th Cir. 2009)).

As Callaway concedes, the 71 month sentence imposed by the district court fell within the guideline range for his offense. In imposing this sentence, the district court considered Callaway's medical condition and military service, but decided that the former was ordinary for a person his age and the latter did not excuse his crime. It decided to assign significant weight to the fact that Callaway knew of Bryant's acute state of need, knew his fraudulent scheme was making it worse, was repeatedly reminded of her worsening circumstances, had numerous opportunities to alleviate the condition he helped cause, and yet resisted every time. We conclude the district court's weighing of these matters was not an abuse of discretion.

Finally, Callaway maintains the district court clearly erred in imposing a $25,000 fine since he asserts the record demonstrates that he cannot pay it. The sentencing guidelines instruct courts to "impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2(a). The defendant has the burden of proving inability to pay. United States v. Berndt, 86 F.3d 803, 808 (8th Cir. 1996). Representation by appointed counsel is a "significant indicator[] of present inability to pay any fine." U.S.S.G. § 5E1.2 cmt. 3. Other factors courts are to consider when determining the amount of a fine include "the need for the combined sentence to reflect the seriousness of the offense . . . to promote respect for the law, to provide just punishment and to afford adequate deterrence." U.S.S.G. § 5E1.2(d)(1). Although it "need not provide detailed findings under each of the factors," a district court "must provide enough information on the record to show that it considered the factors . . . so that the appellate court can engage in meaningful review." Berndt, 86 F.3d at 808.

Callaway was represented by a public defender, and the district court acknowledged that the presentence report indicated his finances were "not in terribly good shape at this point." However, the presentence report also indicated that

Callaway would be able to make payments toward a fine and restitution even if he were incarcerated. The district court thus concluded that Callaway "has had the ability to earn relatively large sums of money" and that there was no "reason why he can't again in the future." It then imposed a fine at the low end of the $10,000 to $100,000 range recommended by the guidelines. Because it reasonably concluded that Callaway would be able to pay the $25,000 fine, the district court did not err in imposing it.

III.

Because the district court did not plainly err in its calculation of the total loss amount from Callaway's fraudulent acts or in adding a 2 level enhancement for a vulnerable victim and because the sentence imposed is substantively reasonable, we affirm Callaway's sentence of 71 months in prison. We also affirm the district court's imposition of a $25,000 fine based on his earning capacity.

_____