# United States Court of Appeals
## For the Eighth Circuit

_____

No. 15-1890

_____

United States of America

*Plaintiff - Appellee*

v.

Austin DeCoster, also known as Jack

*Defendant - Appellant*

------------------------------

National Association of Manufacturers; Cato Institute; Washington Legal Foundation; Chamber of Commerce of the United States; Pharmaceutical Research and Manufacturers of America

*Amici on Behalf of Appellant(s)*

_____

No. 15-1891

_____

United States of America

*Plaintiff - Appellee*

v.

Peter DeCoster

*Defendant - Appellant*

-----------------------------

National Association of Manufacturers; Cato Institute; Washington Legal Foundation

*Amici on Behalf of Appellant(s)*

_____

Appeals from United States District Court
for the Northern District of Iowa - Ft. Dodge

_____

Submitted: March 17, 2016
Filed: July 6, 2016

_____

Before MURPHY, BEAM, and GRUENDER, Circuit Judges.

_____

MURPHY, Circuit Judge.

Austin "Jack" DeCoster and Peter DeCoster both pled guilty, as "responsible corporate officers" of Quality Egg, LLC, to misdemeanor violations of 21 U.S.C. § 331(a) for introducing eggs that had been adulterated with salmonella enteritidis into interstate commerce. The district court[1] sentenced Jack and Peter to three months imprisonment. The DeCosters appeal, arguing that their prison sentences and 21 U.S.C. § 333(a)(1) are unconstitutional, and claiming in the alternative that their prison sentences were procedurally and substantively unreasonable. We affirm.

_____

[1]The Honorable Mark W. Bennett, United States District Judge for the Northern District of Iowa.

## I.

Jack DeCoster owned Quality Egg, LLC, an Iowa egg production company. Jack's son Peter DeCoster served as the company's chief operating officer. Quality Egg operated six farm sites with 73 barns which were filled with five million egg laying hens. It also had 24 barns which were filled with young chickens that had not yet begun to lay eggs. Additionally, the company owned several processing plants where eggs were cleaned, packed, and shipped.

Jack also owned and operated several egg production companies in Maine, and Peter worked at those facilities. In 2008, salmonella enteritidis ("salmonella") tests conducted at the Maine facilities came back positive. The DeCosters succeeded in eliminating salmonella from their Maine facilities by following the recommendations of hired consultants, including poultry disease specialist Dr. Charles Hofacre and rodent control expert Dr. Maxcy Nolan.

Periodically the DeCosters also tested the Iowa hens and facilities for salmonella. Some of these tests came back positive in 2006, and the positive test results increased in frequency through the fall of 2010. Until the USDA adopted its new egg safety rule in July 2010, Quality Egg was not legally obligated to conduct salmonella tests of its eggs after receiving positive environmental test results. Nevertheless, Quality Egg tested its eggs in April 2009 after being notified that a Minnesota restaurant purchaser had had a salmonella outbreak. The sample of its eggs tested negative for salmonella.

Other than conducting the single egg test in April 2009, Quality Egg did not test or divert eggs from the market before July 2010 despite receiving multiple positive environmental and hen test results. In 2009 the DeCosters hired Dr. Hofacre and Dr. Nolan to consult on the company's Iowa operations. The consultants recommended implementing the same measures in Iowa as had been used in Maine.

Although the DeCosters claim they adopted all of the recommendations, the precautions implemented by Quality Egg failed to eradicate salmonella. The Centers for Disease Control and Prevention estimated that about 56,000 Americans fell ill with salmonellosis in 2010 after consuming contaminated eggs. In August 2010, federal and state officials determined that the salmonella outbreak had originated at Quality Egg's facilities. In response Quality Egg recalled eggs that had been shipped from five of its six Iowa farm sites between May and August 2010.

The FDA inspected the Quality Egg operations in Iowa from August 12–30, 2010. Investigators discovered live and dead rodents and frogs in the laying areas, feed areas, conveyer belts, and outside the buildings. They also found holes in the walls and baseboards of the feed and laying buildings. The investigators discovered that some rodent traps were broken, and others had dead rodents in them. In one building near the laying hens, manure was found piled to the rafters; it had pushed a screen out of the door which allowed rodents into the building. Investigators also observed employees not wearing or changing protective clothing and not cleaning or sanitizing equipment.

The FDA concluded that Quality Egg had failed to comply with its written plans for biosecurity and salmonella prevention. One government expert reported that "there were minimal to no records from the poultry [] barns to indicate that company personnel [had] implemented the written plans [to eliminate salmonella]." The agency also discovered that the company's eggs tested positive for salmonella at a rate of contamination approximately 39 times higher than the current national rate, and that the contamination had spread throughout all of the Quality Egg facilities. In October 2010 the FDA instructed Quality Egg to euthanize every hen, remove the manure, repair its facilities, and disinfect its barns to prevent the risk of another outbreak.

The government then began a criminal investigation of the company's food safety practices and ultimately filed a criminal information against Quality Egg and both of the DeCosters. The investigation revealed that Quality Egg previously had falsified records about food safety measures and had lied to auditors for several years about pest control measures and sanitation practices. Although its food safety plan stated that Quality Egg performed flock testing to identify and control salmonella, no flock testing was ever done. Quality Egg employees had also bribed a USDA inspector in 2010 to release eggs for sale which had been retained or "red tagged" for failing to meet minimum quality grade standards. Quality Egg also misled state regulators and retail customers by changing the packing dates of its eggs and selling the misbranded eggs into interstate commerce. The parties additionally stipulated that one Quality Egg employee was prepared to testify at trial that Jack DeCoster had once reprimanded him because he had not moved a pallet of eggs in time to avoid inspection by the USDA. The investigation also revealed that in 2008 Peter DeCoster had made inaccurate statements to Walmart about Quality Egg's food safety and sanitation practices.

Quality Egg pled guilty to: (1) a felony violation of 18 U.S.C. § 201(b)(1) for bribing a USDA inspector, (2) a felony violation of 21 U.S.C. § 331(a) for introducing misbranded eggs into interstate commerce with intent to defraud and mislead, and (3) a misdemeanor violation of 21 U.S.C. § 331(a) for introducing adulterated eggs into interstate commerce. Jack and Peter each pled guilty to misdemeanor violations of 21 U.S.C. § 331(a) as responsible corporate officers under the Food Drug & Cosmetic Act (FDCA). In their plea agreements, the DeCosters stated that they had not known that the eggs were contaminated at the time of shipment, but stipulated that they were in positions of sufficient authority to detect, prevent, and correct the sale of contaminated eggs had they known about the contamination. The parties also stipulated that the DeCosters' advisory guideline range was 0 to 6 months imprisonment, and both defendants agreed to be sentenced based on facts the sentencing judge found by a preponderance of the evidence.

-5-

Before sentencing, the DeCosters argued that sentences of incarceration would be unconstitutional because they had not known that the eggs were contaminated at the time they were shipped. The district court denied the motions, imposed $100,000 fines on both Jack and Peter DeCoster and sentenced them to three months imprisonment. See 21 U.S.C. § 333(a)(1) (explaining that anyone who violates section 331 "shall be imprisoned for not more than one year or fined not more than $1,000, or both"); 18 U.S.C. § 3571(b)(5) (setting maximum fine of $100,000 for class A misdemeanor not resulting in death). The court determined that although nothing in the record indicated that Peter and Jack had actual knowledge that the eggs they sold were infected with salmonella, the record demonstrated that their safety and sanitation procedures were "egregious," that they ignored the positive salmonella environmental test results before July 2010 by not testing their eggs, and that they knew that their employees had deceived and bribed USDA inspectors. The district court explained that the record supported the inference that the DeCosters had "created a work environment where employees not only felt comfortable disregarding regulations and bribing USDA officials, but may have even felt pressure to do so." The district court accordingly concluded that this was not a case involving "a mere unaware corporate executive."

The DeCosters appeal, arguing that their prison sentences under 21 U.S.C. § 333(a)(1) are unconstitutional under the Due Process Clause and the Eighth Amendment. In the alternative they claim that their sentences were procedurally and substantively unreasonable.

II.

Under the FDCA responsible corporate officer concept, individuals who "by reason of [their] position in the corporation [have the] responsibility and authority" to take necessary measures to prevent or remedy violations of the FDCA and fail to do so, may be held criminally liable as "responsible corporate agents," regardless of

whether they were aware of or intended to cause the violation.  United States v. Park, 421 U.S. 658, 673–74 (1975).  The FDCA "punishes neglect where the law requires care, or inaction where it imposes a duty" because according to Congress, the "public interest in the purity of its food is so great as to warrant the imposition of the highest standard of care on distributors."  Id. at 671 (internal quotation marks omitted).  A corporate officer may avoid liability under this doctrine by showing that he was "powerless to prevent or correct the violation."  Id. at 673 (internal quotation marks omitted).

The DeCosters argue that their prison sentences violate due process and the Eighth Amendment.  The government contends that because the DeCosters raise an Eighth Amendment claim, their case is governed exclusively by that amendment.  See Albright v. Oliver, 510 U.S. 266, 273 (1994).  The Supreme Court has explained that "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims."  Id. (internal quotation marks omitted).

The DeCosters raise two separate constitutional claims.  They first argue that their sentences are not proportional to their crimes as required by the Eighth Amendment.  See Graham v. Florida, 560 U.S. 48, 60 (2010).  They also argue that the penalty of incarceration of any length for this misdemeanor offense would violate substantive due process.  See Zadvydas v. Davis, 533 U.S. 678, 690 (2001); see also United States v. Greenbaum, 138 F.2d 437, 438 (3d Cir. 1943) (concluding that three month prison sentence for corporate officer's FDCA misdemeanor violation did not violate due process); United States v. Higgins, 2011 WL 6088576, at *10 (E.D. Pa. Dec. 7, 2011) (same for nine month prison sentence).

We review de novo a substantive due process claim.  United States v. Clemmons, 461 F.3d 1057, 1061 (8th Cir. 2006).  The DeCosters argue that their

prison sentences are unconstitutional because they did not personally commit wrongful acts. They analogize this case to others where courts have determined that due process is violated when prison terms are imposed for vicarious liability crimes. See Lady J. Lingerie, Inc. v. City of Jacksonville, 176 F.3d 1358, 1367 (11th Cir. 1999); State v. Guminga, 395 N.W.2d 344, 346 (Minn. 1986); Davis v. City of Peachtree City, 304 S.E.2d 701, 703–04 (Ga. 1983); Commonwealth v. Koczwara, 155 A.2d 825, 830 (Pa. 1959). The Eleventh Circuit explained in Lady J. that "due process prohibits the state from imprisoning a person without proof of some form of personal blameworthiness more than a 'responsible relation.'" 176 F.3d at 1367.

Officer liability under the FDCA, however, is not equivalent to vicarious liability. See Park, 421 U.S. at 674–75. Under vicarious liability, a supervisory party is held liable "for the actionable conduct of a subordinate . . . based on the relationship between the two parties." *Liability*, Black's Law Dictionary (10th ed. 2014). Under the FDCA, in contrast, a corporate officer is held accountable not for the acts or omissions of others, but rather for his own failure to prevent or remedy "the conditions which gave rise to the charges against him." See Park, 421 U.S. at 675. Thus, "some measure of blameworthiness" is "import[ed]" directly to the corporate officer. Id. at 673.

Here, as owner of Quality Egg, Jack decided which barns were subject to salmonella environmental testing, and as chief operating officer, Peter coordinated many of the company's salmonella prevention and rodent control efforts. Neither of the DeCosters claim to have been "powerless" to prevent Quality Egg from violating the FDCA. See id. Despite their familiarity with the conditions in the Iowa facilities, they failed to take sufficient measures to improve them. On this record, the district court reasonably found that "the defendants 'knew or should have known,' of the risks posed by the insanitary conditions at Quality Egg in Iowa, 'knew or should have known' that additional testing needed to be performed before the suspected shell eggs were distributed to consumers, and 'knew or should have known' of [] proper remedial

-8-

and preventative measures to reduce the presence of [salmonella]." The FDCA "punishes neglect where the law requires care." Id. at 671 (internal quotation marks omitted). We conclude that the record here shows that the DeCosters are liable for negligently failing to prevent the salmonella outbreak. See id. at 678–79 (Stewart, J., dissenting) (reading majority opinion in Park as establishing a negligence standard).

The DeCosters argue that their prison sentences also violate the Due Process Clause because they did not know that the eggs the company distributed had salmonella. We have explained that "the imposition of severe penalties, especially a felony conviction, for the commission of a morally innocent act may violate" due process. See United States v. Enochs, 857 F.2d 491, 494 n.2 (8th Cir. 1988). The elimination of a mens rea requirement does not violate the Due Process Clause for a public welfare offense where the penalty is "relatively small," the conviction does not gravely damage the defendant's reputation, and congressional intent supports the imposition of the penalty. See Staples v. United States, 511 U.S. 600, 617 (1994) (citing Morissette v. United States, 342 U.S. 246, 256 (1952)); Holdridge v. United States, 282 F.2d 302, 309–10 (8th Cir. 1960).

The three month prison sentences the DeCosters received were relatively short. See Staples, 511 U.S. at 617. We have previously determined that even a maximum statutory penalty of one year imprisonment for a misdemeanor offense is "relatively small" and does not violate due process. See United States v. Flum, 518 F.2d 39, 43–45 (8th Cir. 1975) (en banc), cert. denied, 423 U.S. 1018 (1975); 21 U.S.C. § 333(a)(1); cf. United States v. Wulff, 758 F.2d 1121, 1125 (6th Cir. 1985) (concluding that a felony conviction which carried a penalty of a maximum of two years imprisonment was not relatively small).

The DeCosters' misdemeanor convictions also do not gravely damage their reputations. In Flum, we explained that a misdemeanor conviction under a federal

law which provided for a maximum imprisonment of one year did not gravely "besmirch" the defendant's reputation because it did not brand him as a "felon or subject him to any burden beyond the sentence imposed." See 518 F.2d at 43; cf. Wulff, 758 F.2d at 1125 (felony conviction would irreparably damage a defendant's reputation because a felon loses his civil rights). Similarly in this case, the DeCosters will not be branded as felons, and the record does not identify any additional civil sanctions they may be subject to beyond their sentences. Finally, the elimination of criminal intent under 21 U.S.C. § 333(a) did not violate due process because, as the Supreme Court has explained, "Congress has seen fit to enforce the accountability of responsible corporate agents dealing with products which may affect the health of consumers by penal sanctions cast in rigorous terms." Park, 421 U.S. at 673.

The dissent argues that we must treat the FDCA, 21 U.S.C. §§ 331(a), 333(a)(1), as requiring a defendant to know he violated the statute in order to be subject to its penalties because the statute has "no express congressional statement" to omit a mens rea requirement. We rely however "on the nature of the statute and the particular character of the items regulated to determine whether congressional silence concerning the mental element of the offense should be interpreted as dispensing with conventional mens rea requirements." Staples, 511 U.S. at 607. The FDCA regulates services and products which affect the health and well being of the public. For this reason, Congress has not required "awareness of some wrongdoing" in order to hold responsible corporate agents accountable for violating the statute. Park, 421 U.S. at 672–73 (internal quotation marks omitted). Although the "requirements of foresight and vigilance imposed on responsible corporate agents [in 21 U.S.C. § 331(a)] are beyond question demanding, and perhaps onerous, [] they are no more stringent" than required to protect the unknowing public from consuming hazardous food, such as salmonella infected eggs. Id. at 672. The language in the FDCA and Supreme Court precedent interpreting the statute support the conclusion that defendants are not required to have known that they violated the FDCA to be subject to the statutory penalties.

-10-

As the Third Circuit explained in United States v. Greenbaum, "[t]he constitutional requirement of due process is not violated merely because mens rea is not a required element of a prescribed crime." 138 F.2d 437, 438 (3d Cir. 1943). In Greenbaum, the court affirmed a corporate president's three month prison sentence for introducing adulterated eggs into interstate commerce in violation of the same statute at issue in this case. Id. at 439. The Greenbaum court explained that "the legislative intent to dispense with mens rea as an element of [a misdemeanor FDCA] offense has a justifiable basis" because such offenses "are capable of inflicting widespread injury, and [] the requirement of proof of the offender's guilty knowledge and wrongful intent would render enforcement of the prohibition difficult if not impossible." Id. at 438. For the same reasons, we conclude that the DeCosters' sentences do not violate the Due Process Clause even though mens rea was not an element of their misdemeanor offenses.

The DeCosters also claim that their sentences violate the Eighth Amendment. We review this issue de novo. United States v. Martin, 677 F.3d 818, 821 (8th Cir. 2012). The Eighth Amendment bars prison sentences that are "grossly disproportionate for a particular defendant's crime." Graham v. Florida, 560 U.S. 48, 60 (2010). To determine whether a specific sentence is grossly disproportionate we weigh "the harshness of the penalty" against "the gravity of the offense," and we also consider the "harm caused or threatened to the victim or to society, and the culpability and degree of the defendant's involvement." United States v. Lee, 625 F.3d 1030, 1037 (8th Cir. 2010) (internal quotation marks omitted).

On this record, the DeCosters' three month prison sentences are not grossly disproportionate to the gravity of their misdemeanor offenses. When defining the statutory penalties in the FDCA, Congress recognized the importance of placing the burden on corporate officers to protect consumers "who are wholly helpless" from purchasing adulterated food products which could make them ill. See United States v. Dotterweich, 320 U.S. 277, 285 (1943). "[T]he public has a right to expect" a

-11-

heightened degree of foresight and care from "those who voluntarily assume positions of authority in business enterprises whose services and products affect the health and well-being of the public that supports them." Park, 421 U.S. at 672. The 2010 salmonella outbreak may have affected up to 56,000 victims, some of whom were hospitalized or suffered long term injuries. For one example, a child hospitalized in an intensive care unit for eight days was saved by antibiotics which damaged his teeth, causing them to be capped in stainless steel.

We conclude this is not "the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality." United States v. Spires, 628 F.3d 1049, 1054 (8th Cir. 2011) (internal quotation marks omitted). Moreover, the DeCosters' three month prison sentences fell at the low end of the prescribed statutory range of 21 U.S.C. § 333(a) (one year maximum), and we have "never held a sentence within the statutory range to violate the Eighth Amendment," United States v. Vanhorn 740 F.3d 1166, 1170 (8th Cir. 2014). We decline to do so here as well. We conclude that the district court's sentences in this case do not violate the Eighth Amendment.

III.

Finally, the DeCosters argue that their sentences are procedurally and substantively unreasonable. "When analyzing a sentence for procedural error, we review a district court's interpretation and application of the guidelines de novo and its factual findings . . . for clear error." United States v. Callaway, 762 F.3d 754, 759 (8th Cir. 2014). We review the substantive reasonableness of a sentence for abuse of discretion. Id. at 760.

The DeCosters claim that their sentences are procedurally unreasonable because the court relied on clearly erroneous facts. See United States v. Feemster, 572 F.3d 455, 461 (8th Cir. 2009). First, the DeCosters argue that the court erred by

-12-

stating that they had "ignore[d]" the positive environmental salmonella tests before 2010. During sentencing a district court may rely on facts it finds by a preponderance of the record evidence. See United States v. Nassif, 921 F.2d 168, 170 (8th Cir. 1990). Here, the court found that while the DeCosters cleaned their barns and administered a second salmonella vaccine to their chickens in 2010, they did not test or divert eggs until July 2010 even though they had reason to suspect their contamination. The court did not clearly err by determining that the actions or inactions of the DeCosters was insufficient and blameworthy under these circumstances. See Park, 421 U.S. at 672 (explaining that corporate officers may be held liable for failing to "devise whatever measures are necessary to ensure compliance with the [FDCA]").

The DeCosters also argue that the district court erred by finding that they "failed to follow" the methods they had previously used to eliminate salmonella in their Maine facilities. They concede however that they previously stipulated that no expert had a basis to testify about whether Quality Egg "fully" and "effectively" implemented all of the specialist recommendations in Iowa. They also agree with the probation office determination that they had not effectively implemented the methods used at their Maine facilities. The district court did not clearly err in interpreting the evidence to show that the DeCosters had failed to follow all of the expert recommendations.

The DeCosters also argue that their sentences are substantively unreasonable because the district court gave substantial weight to prior offenses and regulatory violations committed by Quality Egg employees even though the DeCosters had not sanctioned those actions and the violations were unrelated to the salmonella outbreak. The sentences here are presumptively reasonable because they are within the stipulated guideline range of 0 to 6 months imprisonment for each defendant. See Callaway, 762 F.3d at 760. Furthermore, the district court did not abuse its discretion by considering the Quality Egg employees' pattern of deceiving the FDA. A

-13-

sentencing court may consider "'any information concerning the background, character, and conduct of [a] defendant.'" See United States v. Rogers, 423 F.3d 823, 828 (8th Cir. 2005) (quoting USSG § 1B1.4). Here, the court considered such background information and found that the DeCosters had "created a work environment where employees not only felt comfortable disregarding regulations and bribing USDA officials, but may have felt pressure to do so." In fact, one employee alleged that Jack DeCoster had once reprimanded him because he had not moved a pallet of eggs in time to avoid inspection by the USDA. Peter DeCoster was similarly personally implicated in the company's violations because of inaccurate statements he made to Walmart about Quality Egg's food safety and sanitation practices.

We conclude that the district court properly considered relevant past conduct and imposed substantively reasonable sentences on the DeCosters.

## IV.

For these reasons the judgments of the district court are affirmed.

GRUENDER, Circuit Judge, concurring.

The DeCosters do not challenge either the constitutionality of § 331(a) or the sufficiency of the factual basis for their pleas. Rather, they claim that due process concerns prevent them from being sentenced to prison for a crime involving no mens rea on their part because it is based solely on their positions as responsible corporate officers—*i.e.*, vicarious liability. I agree with the dissent that imprisonment based on vicarious liability would raise serious due process concerns. However, because the district court found the DeCosters negligent, they were not held vicariously liable for violations committed by others, and this case thus does not implicate these concerns. I therefore concur in the judgment and join Judge Murphy's opinion to the extent that

-14-

it recognizes that the DeCosters were negligent.[1]  I write separately in order to make clear my view that *Park* requires a finding of negligence in order to convict a responsible corporate officer under § 331.

The DeCosters pleaded guilty to misdemeanor violations of 21 U.S.C. § 331(a), which provides:

> The following acts and the causing thereof are prohibited:
>
> (a) The introduction or delivery for introduction into interstate commerce of any food . . . that is adulterated or misbranded.

A misdemeanor violation of § 331 is punishable by up to one year's imprisonment. § 333(a)(1).  On its face, § 331(a) appears to impose strict liability on defendants who introduce or cause to be introduced into interstate commerce any adulterated food. *Cf. United States v. Carlson*, 810 F.3d 544, 555 (8th Cir. 2016) (applying strict liability standard to defendant convicted of misdemeanor violation of § 331 where defendant personally participated in violations).  Nothing in the statute clearly states that a corporate officer can be imprisoned for acts committed solely by a subordinate. However, the *Park* Court read § 331 to hold corporate officers liable for "causing" violations committed by their subordinates. *See United States v. Park*, 421 U.S. 658, 673-74, 678-79 (1975).[2]  The question, then, is whether § 331 applies vicarious

---

[1] I also join Judge Murphy's opinion in rejecting the DeCosters' Eighth Amendment challenge and their claims that the sentences are procedurally and substantively unreasonable.

[2] The dissent attempts to distinguish *Park* from this case by pointing out that the defendant in *Park* was convicted under § 331(k), not § 331(a).  Yet the theory underlying *Park* prosecutions—that the executive "caused" the violation by breaching the duty of care to ensure compliance with the FDCA—comes from language that applies to all of § 331.

liability to corporate officers or whether corporate officers can only be in violation when they negligently fail to prevent their subordinates' violations. For three reasons, I read *Park* to require a showing of negligence before exposing a responsible corporate officer to imprisonment for the acts of a subordinate.

First, the language from *Park* strongly suggests—if not outright asserts—that the Supreme Court adopted a negligence standard for a § 331 conviction. The Court noted that the FDCA "punishes 'neglect where the law requires care, or inaction where it imposes a duty.'" *Park*, 421 U.S. at 671 (quoting *Morissette v. United States*, 342 U.S. 246, 255 (1952)). A corporate officer is liable where he could have prevented a violation "with no more care than society might reasonably expect and no more exertion than it might reasonably exact from one who assumed his responsibilities." *Id.* (quoting *Morissette*, 342 U.S. at 256). According to the Court, the FDCA "imposes not only a positive duty to seek out and remedy violations when they occur but also, and primarily, a duty to implement measures that will insure that violations will not occur." *Id.* at 672. This language establishes negligence as the standard. *See Black's Law Dictionary* (10th ed. 2014) (defining negligence as "[t]he failure to exercise the standard of care that a reasonably prudent person would have exercised in a similar situation; any conduct that falls below the legal standard established to protect others against unreasonable risk of harm"). Moreover, the *Park* dissent expressly concluded that the Court had articulated a negligence standard. *See id.* at 678-79 (Stewart, J., dissenting) (interpreting the majority opinion as establishing a negligence standard but concluding that the jury instructions "did not conform to the standards that the Court itself sets out today"). Tellingly, the *Park* Court did not contest the dissent's claim that the standard it had described amounted to negligence.

Second, I read the language from *Park* as establishing a negligence standard as a matter of constitutional avoidance. *See Union Pac. R. Co. v. U.S. Dep't of*

-16-

*Homeland Sec.*, 738 F.3d 885, 892-93 (8th Cir. 2013). The few courts that have considered the question all agree that imprisonment based on vicarious liability violates substantive due process. *Lady J. Lingerie, Inc. v. City of Jacksonville*, 176 F.3d 1358, 1367-68 (11th Cir. 1999); *Davis v. City of Peachtree City*, 304 S.E.2d 701, 703 (Ga. 1983); *State v. Guminga*, 395 N.W.2d 344, 345 (Minn. 1986).[3] Section 333(a) imposes up to one year's imprisonment for any misdemeanor violation of § 331. For this reason, I would interpret *Park* not to impose vicarious liability on executives under § 331. *See, e.g.*, *Clark v. Martinez*, 543 U.S. 371, 380-81 (2005) ("[W]hen deciding which of two plausible statutory constructions to adopt, a court must consider the necessary consequences of its choice. If one of them would raise a multitude of constitutional problems, the other should prevail—whether or not those constitutional problems pertain to the particular litigant before the Court.").

Finally, reading *Park* to require negligence is consistent with the Supreme Court's practice of interpreting statutes that fail to state a specific mens rea in a way that avoids "criminaliz[ing] a broad range of apparently innocent conduct." *See Liparota v. United States*, 471 U.S. 419, 426 (1985). Here, given the broad range of conduct that would be criminalized under a vicarious liability standard—essentially all conduct committed by corporate officers that falls short of eliminating every possible FDCA violation—I instead read *Park* as providing that a corporate officer "causes" a subordinate's violation of § 331 only when the violation resulted from the corporate officer's negligence.

I concur in the judgment because the DeCosters were negligent in failing to prevent the FDCA violations. Both pleaded guilty to failing to prevent the introduction of adulterated food into interstate commerce despite holding "position[s]

---

[3] *See also Commonwealth v. Koczwara*, 155 A.2d 825, 830 (Pa. 1959) (holding that imprisonment for vicarious liability crime violated due process under Pennsylvania Constitution).

of sufficient authority . . . to detect, prevent, and correct the sale" of the eggs. Further, I agree with Judge Murphy that the district court found sufficient facts to support the conclusion that the DeCosters were negligent.[4]  In particular, the court concluded that the DeCosters "knew or should have known" about the risks presented by the insanitary conditions at Quality Eggs's Iowa facilities and about the proper preventative and remedial measures that they should have taken in response.  *See Park*, 421 U.S. at 671 ("The accused, if he does not will the violation, usually is in a position to prevent it with no more care than society might reasonably expect and no more exertion than it might reasonably exact from one who assumed his responsibilities." (quoting *Morissette*, 342 U.S. at 255)).  The DeCosters' challenge to their sentences relies on the premise that they were held vicariously liable for their subordinates' violations—that is, liability was imputed to them based solely on their positions in the company.  But because the DeCosters were negligent, their liability is not vicarious.  Instead, they are responsible for their own failures to exercise reasonable care to prevent the introduction of adulterated food.  The law is clear that a defendant can be sentenced to imprisonment based on negligence—or, for that matter, based on strict liability stemming from his own conduct.  *See Staples v. United States*, 511 U.S. 600, 607 & n.3 (1994); *Morissette*, 342 U.S. at 251 n.8.  I therefore concur in the judgment and join Judge Murphy's opinion to the extent that it relies on the DeCosters' negligence in affirming their sentences of imprisonment.

---

[4]The DeCosters agreed to have the district court sentence them based on facts found at sentencing.  While the DeCosters objected at sentencing to potential imprisonment on Sixth Amendment grounds, *see Apprendi v. New Jersey*, 530 U.S. 466 (2000), they do not argue this point on appeal and therefore waive this objection. *See United States v. Cowan*, 696 F.3d 706, 709 n.2 (8th Cir. 2012).

BEAM, Circuit Judge, dissenting.

Austin (Jack) and Peter DeCoster, entered pleas of guilty because their corporation sold eggs contaminated by a strain of salmonella enteritidis bacteria during a period of time extending "[b]etween about the beginning of 2010 and in or about August 2010." The government contends that these were federal misdemeanor offenses under 21 U.S.C. § 331(a) and § 333(a)(1). As noted by the district court,[1] they were at the time of the alleged offenses the two ranking corporate officers of Quality Egg, LLC (Quality Egg)–Jack being the trustee of the trust that owned Quality Egg and Peter, his son, being the Chief Operating Officer of this multistate corporate enterprise.

At all relevant times, Quality Egg operated six Iowa farms with 73 barns filled with 5 million laying hens and 24 barns filled with young chicks that had not begun to lay eggs. Quality Egg also had several processing plants where eggs were cleaned, packed, and shipped. Jack also owned several other egg-production companies in the state of Maine where Peter apparently spent part of his working time. Collectively, these were large, diverse, and labor-intensive agricultural operations requiring several levels and areas of management, as well as a substantial number of "hands-on" production workers.

At the outset, it is compelling to discern that the DeCosters' pleas of guilty and waiver of trial by jury in defense of these criminal misdemeanor charges were substantially cabined by a series of factual and procedural stipulations by the

---

[1]I admit to advancing a measure of factual redundancy by way of this dissent. However, I do so to lay a foundation for some additional evidentiary emanations crucial to an adequate understanding of the management of this complex business operation insofar as such management relates to the criminal prosecution of these two corporate executives.

prosecutors and the DeCosters pursuant to Federal Rule of Criminal Procedure 11, all of which were accepted by and binding upon the district court.

The record discloses that salmonella contamination of eggs sold by Quality Egg was the sole basis for adulteration claims under § 331(a) concerning the DeCosters as individuals. Given such factual predicate, the government stipulated that "[t]o date" (April 18, 2014), "the government's investigation has not identified any personnel employed by or associated with Quality Egg, including the defendant[s], who had knowledge during the [charged] time frame from January 2010 through August 12, 2010, that eggs sold by Quality Egg were, in fact, contaminated with *Salmonella* [*Enteritidis*]. Further, the government conceded that the criminal complaint against the DeCosters as executives of Quality Egg was animated by salmonella-prevention regulations published by the FDA on July 9, 2009, but not placed in force until July 9, 2010, through adoption of an Egg Safety Rule. The government also stipulated that "until adoption of the Egg Safety Rule in July 2010, there was no legal or regulatory requirement" for Quality Egg to comply with these regulations. The record also establishes that, given the state of the art of poultry-sanitation management, egg-safety difficulties, especially involving salmonella contamination, are inherent in such operations.[2]

---

[2]Respectfully, I do not agree that <u>Park</u>, 421 U.S. 658, casts a long, dark incarceration shadow over the DeCosters as contended by the court's opinion and the separate concurrence, especially in view of the more recent Supreme Court jurisprudence emerging from <u>Zadvydas</u>, <u>Staples</u>, and <u>Torres</u>. The opinions should note that Park's sentence actually amounted to $250 in fines and no incarceration.

It is also unfair for the concurrence to contend that the DeCosters negligently failed to prevent a salmonella outbreak within the broad reach of their corporate operations. After all, the government fully conceded in the plea agreements used to obtain the convictions that neither the DeCosters nor any other Quality Egg employees were aware of any salmonella contamination at any times relevant to the

In short, large numbers of employees and supervisors were needed and employed by Quality Egg in an attempt to avoid problems with this ubiquitous pathogen. Thus, the misdemeanor convictions found and imposed by the district court in response to the DeCosters' very limited guilty pleas amounted to crimes and sentences based upon almost wholly nonculpable conduct.

On the record and the stipulated facts, it is also clear that the DeCosters lacked the necessary mens rea or "guilty mind," that is "[t]he state of mind that the prosecution, to secure a conviction, must prove that a defendant had when committing a crime," *Mens Rea*, Black's Law Dictionary (10th ed. 2014). This mens rea requirement is especially applicable when the crime, as here, is punished by imprisonment. Although § 333(a)(1) purports to authorize a criminal misdemeanor sentence of "imprison[ment] for not more than one year," the DeCosters' presentence motions to preclude any such sentence of imprisonment based upon the vicarious-liability standard the district court applied should have been granted.

The Fifth Amendment Due Process Clause forbids the government from depriving any person of liberty without due process of law. "Freedom from imprisonment–from government custody, detention, or other forms of physical restraint–lies at the heart of the liberty that Clause protects." Zadvydas v. Davis, 533 U.S. 678, 690 (2001). Such a due process violation as attends the DeCosters' prison sentence is well illustrated in Staples v. United States, 511 U.S. 600 (1994). Under the National Firearms Act, 26 U.S.C. §§ 5801-5872, any fully automatic weapon is a "firearm" within the meaning of the statute. Staples, 511 U.S. at 602. The Act, in

_____

misdemeanor violations charged in the criminal informations. It is likewise inequitable in my view for the court and the concurrence to credit the government's inflammatory sentencing rhetoric received by the district court to support corporate-officer incarceration especially since such pleas were obtained through benign factual stipulations of criminal liability fully agreed upon by the parties.

turn, makes it a crime to possess a firearm that is not registered. Id. at 602-03. Staples possessed an unregistered semi-automatic rifle that, unbeknownst to him, had been modified to permit automatic firing. Id. at 603. Upon prosecution under the Act, the district court ruled that the government did not have to prove that Staples knew the weapon fired automatically because of the modification by someone else. Id. at 604. He was convicted and sentenced to prison. Id.

On appeal, the Supreme Court reversed, saying "we must construe [an imprisonment] statute in light of the background rules of the common law in which the requirement of some *mens rea* for a crime is firmly embedded." Id. at 605 (citation omitted). While the government argued, as it does in this case, that a presumption of the need for a finding of mens rea did not apply in Staples, the Supreme Court rejected the argument and reversed, holding that Staples's lack of knowledge of the weapon's capability of automatic fire prohibited his conviction and prison sentence. Id. at 619. And, the Supreme Court's more recent and perhaps more forceful iteration of this state-of-mind requirement came in Torres v. Lynch, 136 S. Ct. 1619 (2016). The Court, amplifying on Staples, stated:

> Consider the law respecting *mens rea*. In general, courts interpret criminal statutes to require that a defendant possess a *mens rea*, or guilty mind, as to every element of an offense. That is so even when the "statute by its terms does not contain" any demand of that kind. In such cases, courts read the statute against a "background rule" that the defendant must know each fact making his conduct illegal. Or otherwise said, they infer, absent an express indication to the contrary, that Congress intended such a mental-state requirement.

Torres, 136 S. Ct. at 1630-31 (citations omitted) (first quoting United States v. X-Citement Video, Inc., 513 U.S. 64, 70 (1994); next quoting Staples, 511 U.S. at 619).

There is, of course, no express congressional statement to the contrary contained in § 331(a) or § 333(a)(1). While it might be possible to concoct an actionable interpretation of § 333(a)(1) that omits a mens rea requirement, Congress has no power to enact a federal statute that violates the Fifth Amendment Due Process Clause.

This court and the district court cite cases that they contend support a rationale that a criminal sentence of imprisonment is sometimes valid without proof of mens rea, or, a guilty mind. But, the cases advanced by the government and the courts cannot bear the load placed upon them, both as matters of fact and law. United States v. Dotterweich, 320 U.S. 277 (1943), a case substantially predating Zadvydas, Staples, and Torres, provided an opinion fashioned to remedy an unexpected jury verdict. Dotterweich, who was the president and general manager of a pharmacal company, was charged, along with his corporation, with three misdemeanor counts of violation of the Federal Food, Drug and Cosmetic Act under § 331(a) and § 331(a)(1). Dotterweich, 320 U.S. at 278. The jury found the corporation not guilty but convicted Dotterweich, fining him $500 on each of the three misdemeanor counts and imposing 60 days of probation. Id.; see United States v. Buffalo Pharmacal Co., 131 F.2d 500, 501 (2d Cir. 1942), rev'd, Dotterweich, 320 U.S. 277. There was no incarceration. The circuit court reversed the conviction and sentence but the Supreme Court reversed on the facts involved. Dotterweich, 320 U.S. at 285. Four justices dissented from Justice Frankfurter's reversal opinion. Id. at 293.

Both courts also advance the holding in United States v. Park, 421 U.S. 658 (1975). As an initial matter, it must be noted that Park was charged with 21 U.S.C. § 331(k), whereas the purported DeCoster violations involve § 331(a). Id. at 660. And, Park was individually charged as President of Acme Markets, Inc., and tried and convicted by a jury on five counts of violating subsection (k). Id. at 660, 666. He was, however, sentenced to $50 per count for a total of $250.00. Id. at 666. There

-23-

was no incarceration. Incarceration of Dotterweich or Park, as we now know, would have violated Supreme Court precedent as clearly established in Zadvydas, Staples, and Torres.

In fashioning sentences or affirmances of such sentences today, the court and the district court opinions complain at length that Quality Egg between 2006 and 2010 failed to sufficiently test eggs for salmonella and perform other corporate activities in connection with its consumption-egg production and marketing. But, the government's individual criminal-activity allegations at issue here are bottomed upon acts occurring only in late July and early August of 2010.

The basis for the court's affirmance of the district court is fully encapsulated as follows:

> Here, as owner of Quality Egg, Jack decided which barns were subject to salmonella environmental testing, and as chief operating officer, Peter coordinated many of the company's salmonella prevention and rodent control efforts. Neither of the DeCosters claim to have been "powerless" to prevent Quality Egg from violating the FDCA. Despite their familiarity with the conditions in the Iowa facilities, they failed to take sufficient measures to improve them. On this record, the district court reasonably found that "the defendants 'knew or should have known,' of the risks posed by the insanitary conditions at Quality Egg in Iowa, 'knew or should have known' that additional testing needed to be performed before the suspected shell eggs were distributed to consumers, and 'knew or should have known' of [] proper remedial and preventative measures to reduce the presence of [salmonella]." The FDCA "punishes neglect where the law requires care." We conclude that the record here shows that the DeCosters are liable for negligently failing to prevent the salmonella outbreak.

Ante at 8-9 (alterations in original) (citations omitted).

-24-

Thus, the court validates the district court's prison sentence based upon the DeCosters' supposed negligence in performing executive functions on behalf of Quality Egg. However, there is no precedent that supports imprisonment without establishing some measure of a guilty mind on the part of these two individuals, and none is established in this case. The government concedes in the DeCosters' plea agreements that they did not know that any eggs distributed by Quality Egg at any relevant times "were, in fact, contaminated with *Salmonella* [*Enteritidis*]." Indeed, the plea agreements explicated above further concede that no person associated with Quality Egg had knowledge of salmonella contamination at any relevant time. And when first alerted to the problem by the FDA in August of 2010, Quality Egg immediately, and at great expense, voluntarily recalled "hundreds of millions of shell eggs produced at Quality Egg's facilities." This is hardly the stuff of "guilty minds."

Finally, I concede that the court cites two cases in which individual prison sentences were imposed for violations of § 331(a) and § 333(a)(1). They are United States v. Greenbaum, 138 F.2d 437 (3d Cir. 1943), and United States v. Higgins, No. 09-403-4, 2011 WL 6088576 (E.D. Pa. Dec. 7, 2011). Neither case is apposite here for reasons of fact or law. Greenbaum is clearly wrong given Supreme Court precedent established since 1943, especially that found in Zadvydas, Staples, and Torres. And defendant Higgins, contrary to the DeCosters, "personally participated in the decisions to proceed with unauthorized clinical trials to test the safety and efficacy of [adulterated compounds] on humans." Higgins, 2011 WL 6088576, at *13.

There is no proof that the DeCosters, as individuals, were infected with a "guilty mind" or, perhaps, even with negligence. Clearly, the improvident prison sentences imposed in this case were due process violations.

I respectfully dissent.

———————————————